692 So.2d 1104 (1996)
Yvonne CAGNOLATTI, etc.
v.
Leslie HIGHTOWER, M.D., et al.
Yvonne CAGNOLATTI, etc.
v.
UNITED MEDICAL CENTER OF NEW ORLEANS, et al.
Nos. 95-CA-2598, 95-CA-2599.
Court of Appeal of Louisiana, Fourth Circuit.
December 11, 1996.
Order Amending Decision on Grant of Partial Rehearing April 9, 1997.
*1106 John Paul Massicot, Frank A. Silvestri, New Orleans, for Plaintiff/Appellant.
Terry B. Deffes, Law Offices of Robert E. Birtel, Metairie, for Defendants/Appellants.
Gregory C. Weiss, Kathryn M. Caraway, Stephen R. Barry, New Orleans, for Defendant/Appellant.
Before CIACCIO, ARMSTRONG and LANDRIEU, JJ.
ARMSTRONG, Judge.
This is a medical malpractice case. After a jury trial, a verdict of $470,000 was rendered in favor of the plaintiff, Ms. Yvonne Cagnolatti. We affirm.
Plaintiffs' decedent, Ms. Pearl Roussell, at the age of 72, suffered a stroke. She was admitted to United Medical Center ("UMC") and, after several days, seemed to be doing well. She was scheduled to be discharged.
The evening before her discharge, defendant Dr. Leslie Hightower, a neurologist, assisted by defendant nurse Alma Nixon, R.N., began to give Ms. Roussell a test that involved the administration, by an intravenous injection, of the drug Tensilon. The test was given in order to determine whether Ms. Roussell suffered from myasthenia gravis. That is a potentially life threatening disease and one of its symptoms, droopy eyelids, was present. The test involved injection of the drug Tensilon. If the patient responded, presumably in this case by elimination of the droopiness of the eyelids, then that is an indication that the patient has myasthenia gravis. Although the effects of Tensilon will not be prolonged enough to make Tensilon a treatment for myasthenia gravis, the short term relief makes it appropriate as a method of diagnosis of the disease. It is undisputed that it was proper for Dr. Hightower to give the test and to administer the Tensilon.[1]
*1107 Dr. Hightower began to administer the Tensilon about or just prior to 7:40 p.m. on May 11, 1990. Soon after he began to inject the Tensilon, Ms. Roussell became nauseous, vomited, and began to sweat. These were symptoms of an adverse reaction to Tensilon. Dr. Hightower discontinued the test. He also ordered, and Nurse Nixon administered, an intramuscular injection of the drug Phenergan. This was to relieve the nausea, vomiting and sweating. Over the next approximately 15 minutes, i.e. from about 7:40 p.m. until about 7:55 p.m., Ms. Roussell's vomiting and sweating subsided. Nurse Nixon's note in the chart reflects that Ms. Roussell still complained of nausea at 7:55 p.m. but Dr. Hightower testified that he was unaware of that complaint.
At about 7:55 p.m., Dr. Hightower left Ms. Roussell's room. Nurse Nixon also left either with Dr. Hightower or at close to the same time. Because Ms. Roussell's vomiting had soiled some of the bed linen, Nurse Nixon asked two nurse's aides to change the bed linens. The two nurse's aides went into Ms. Roussell's room and began to change the bed linens. Some time prior to 8:25 p.m., the nurse's aides reported that Ms. Roussell "went limp".[2]
A "code", an emergency call, was made at 8:25 p.m. and it was determined at that time that Ms. Roussell had no pulse and no respiration. She was "resuscitated", i.e. her pulse and respiration were restored with various emergency medical procedures and drugs, and she was transferred to the Intensive Care Unit. Ms. Roussell was in a coma at this time, from which she never revived, and she died about 70 days later.
There was considerable controversy at trial about the charting, i.e. the writing down in Ms. Roussell's hospital chart, of the above described events of the evening of May 11, 1990. This is particularly so with regard to the charting of Ms. Roussell's "vital signs", i.e. her pulse rate, respiration rate and blood pressure. As will be apparent below, Ms. Roussell's pulse rate was especially significant.
Nurse Nixon wrote in the chart that, at 7:40 p.m., Ms. Roussell's pulse rate was 88. She testified that she probably took this pulse rate before the Tensilon was administered. Nurse Nixon's 7:55 p.m. note in the chart also reflects that, at 7:55 p.m., Ms. Roussell's pulse rate was again 88. However, a handwriting expert called by the plaintiff testified that both nurse Nixon's 7:55 p.m. note of the pulse rate and Dr. Hightower's note of the 7:55 p.m. pulse rate, had originally reflected a pulse rate of 58 and had been altered later to 88. Both nurse Nixon and Dr. Hightower denied such alteration, and testified that their notes had always reflected a 7:55 p.m. pulse rate of 88. However, the handwriting expert's qualifications were most impressive, and his analysis persuasive, and the jury reasonably could, and presumably did, resolve this credibility issue against nurse Nixon and Dr. Hightower.[3]
The pulse rate was a key fact at trial because, bradycardia, a slow down of the heart rate, is a possible side effect of Tensilon. Bradycardia can progress to outright cardiac arrest, and that is what the plaintiff contends must have happened in this case. Any pulse rate below 60 is, by definition, bradycardia. So the pulse rate of 58 at 7:55 p.m., which was 15 minutes after the administration of Tensilon, was indicative of bradycardia.
*1108 The plaintiffs' principal theory is that, with a pulse rate of 58 at 7:55 p.m., Ms. Roussell was already experiencing an adverse reaction to Tensilon and that the bradycardia progressed to cardiac arrest at or prior to 8:25 p.m. Although the plaintiff does not contend that it was improper for Dr. Hightower to administer Tensilon, she does contend that he was negligent by failing to order proper monitoring of Ms. Roussell after 7:55 p.m. and that nurse Nixon was negligent by failing to conduct proper monitoring of Ms. Roussell after 7:55 p.m. The plaintiff contends that, if there had been proper monitoring of Ms. Roussell, that would have increased Ms. Roussell's chances of survival. The plaintiff also contends that, once the adverse reaction to Tensilon manifested itself, Dr. Hightower should have treated it with the antidote for Tensilon, Atropine, rather than Phenergan. She contends that, if Atropine had been administered, that would have increased Ms. Roussell's chances of survival. The jury found nurse Nixon 70% at fault and Dr. Hightower 30% at fault. As Dr. Hightower was solely responsible for the choice of medication, it appears that the jury was more impressed by the plaintiffs' theory of lack of monitoring than their theory regarding medication.[4]
Dr. Leon Weisberg, a neurologist who was a member of the medical review panel which considered this case, testified that bradycardia is one of the possible adverse reactions to Tensilon. He also testified that a pulse rate of 58 would constitute bradycardia. Perhaps most importantly, he testified that, if Ms. Roussell's pulse rate went from 88 to 58 in the 15 minutes from 7:40 p.m. to 7:55 p.m., then that decrease would be indicative of a cardiac reaction to the Tensilon and close monitoring of Ms. Roussell would be called for. He would have put Ms. Roussell on a cardiac monitor at that point and such a procedure would be the standard of care. He testified that such close monitoring would have increased her chances of survival. Although Dr. Weisberg would not necessarily have given Ms. Roussell Atropine when her pulse was 58, if it had continued to go down, to 52, then he would have administered Atropine. Dr. Weisberg did testify that, if the first onset of bradycardia was at 8:25 p.m., 45 minutes after the test, then it was unlikely to be the result of the Tensilon. But, in view of the testimony that the chart was altered, and that Ms. Roussell's pulse was charted as 58 at 7:55 p.m., the jury could reasonably conclude that the bradycardia had begun by 7:55 p.m.
Dr. Barnes, an internal medicine specialist who was one of Ms. Roussell's treating physicians, testified that if Ms. Roussell had bradycardia within 15 minutes of the administration of Tensilon (i.e. by 7:55 p.m.), then more likely than not it was related to the Tensilon. He testified that, if Ms. Roussell's pulse rate dropped from 88 to 58 in 15 minutes (i.e. 7:40 p.m. to 7:55 p.m.) then "very aggressive" monitoring of Ms. Roussell would have been called for. Such aggressive monitoring would consist of having the nurse check Ms. Roussell every 5 minutes or so or putting Ms. Roussell on a cardiac monitor. He testified that such monitoring between 7:55 p.m. and 8:25 p.m. would have increased Ms. Roussell's chances of survival. Also, he testified that Atropine is routinely used to reverse bradycardia although he did not specify at what point he would have administered Atropine.
Nurse Sandra Dawes, R.N., who was on the medical review panel that considered this case, testified that if the pulse rate went from 88 to 58 in 15 minutes, then it would mean that the patient was bradycardic and need monitoring very closely for the next 30 minutes. She also testified that such close monitoring would have increased the chances of survival. Nurse Dawes testified that, when a patient is bradycardic, the nurse must report that to the doctor or take other action, and not simply do nothing.
Dr. John D. Olson, a neurologist who was a member of the medical review panel that considered this case, testified that, if the patient's pulse rate drops from 88 to 58 in 15 minutes, then the nurse should closely watch *1109 the patient's vital signs. He did testify that he did not believe the Tensilon caused the arrest because the arrest was "too late", but that opinion was based upon the assumption that the first sign of bradycardia came at 8:25 p.m. which was 45 minutes after the administration of Tensilon.
Dr. James T. O'Donnell, Ph.D., who is not a medical doctor but is a pharmacologist who teaches medical students at a medical school, testified that bradycardia is a symptom of an adverse reaction to Tensilon. He also testified that, if Atropine had been administered, it would have prevented the arrest. As to Phenergan, a drug as to which he has particular expertise because of a previous representation of its manufacturer, Dr. O'Donnell testified that it could relieve some symptoms of the adverse reaction to Tensilon, but could actually worsen bradycardia. He expressly testified that he did not know the standard of care of a neurologist, such as Dr. Hightower, in performing a test with Tensilon.
Dr. Hightower argues that the plaintiff failed to prove that Ms. Roussell's arrest was caused by the Tensilon and by Dr. Hightower's subsequent treatment of Ms. Roussell. Dr. Hightower relies upon the testimony of Dr. Weisberg and the other physicians that, assuming that Ms. Roussell's pulse rate was 88 at 7:55 p.m. and that there was no sign of cardiac involvement until 8:25 p.m., there would be no causal connection between the Tensilon and the arrest. However, Dr. Weisberg and the other physicians also testified that, if Ms. Roussell's pulse rate was 58 at 7:55 p.m., then that was indicative of cardiac involvement in an adverse reaction to the Tensilon. Further, Dr. Weisberg and others testified that, if Ms. Roussell's pulse rate was 58 at 7:55 p.m., then close monitoring from that time would have increased Ms. Roussell's chances of survival. Thus, because the jury could reasonably find that Ms. Roussell's pulse rate was 58 at 7:55 p.m., the plaintiff did establish a causal link between the Tensilon and the arrest and between Dr. Hightower's treatment and the arrest.[5] Dr. Hightower argues that the trial court erred by denying his motion for directed verdict because none of the physicians who testified established a standard of care from which Dr. Hightower deviated. In that connection, Dr. Hightower also argues that the trial court erred by relying upon the testimony of a non-physician, the pharmacologist, to deny Dr. Hightower's original motion for directed verdict.
We believe it is readily apparent from our discussions above of the testimony of Dr. Weisberg and the other physicians that there was ample physician testimony to raise an issue for the jury as to whether Dr. Hightower met the standard of care. Dr. Weisberg and others testified that, if Ms. Roussell's pulse rate was 58 at 7:55 p.m., then close monitoring, such as the use of a cardiac monitor but at least checking Ms. Roussell every five minutes or so, would have been the standard of care. It is undisputed that no such close monitoring took place after 7:55 p.m. until the code was called for the arrest about 8:25 p.m.[6] As the jury reasonably could have concluded that the pulse rate was 58 at 7:55 p.m., the jury also could reasonably conclude that Dr. Hightower failed to meet the standard of care. Dr. Hightower's motion for directed verdict was properly denied.
Dr. Hightower very briefly asserts that the trial court erred by instructing the jury that "it could consider the expert testimony of O'Donnell [the pharmacologist] who *1110 is not a physician and who, admittedly, cannot testify about a physician's standard of care". The trial court instructed the jury that it could consider (1) the decision of the medical review panel, (2) the expert testimony of the four physicians (Drs. Weisberg, Barnes, Olson and Hightower himself) and the pharmacologist and (3) the medical literature testified about by the expert witnesses. Thus, the pharmacologist testimony was one of only a number of sources the jury was directed to by the jury instruction. The four physicians testified about the standard of care and, to some extent, about Tensilon, Atropine and Phenergan. The pharmacologist specifically testified that he did not know the standard of care but testified, with evident greater expertise than the physicians, with regard to the three drugs at issue. The properties of these drugs were highly material at trial, the greater expertise of the pharmacologist with regard to the drugs was of obvious value, and his testimony clearly should have been considered by the jury in conjunction with the testimony of the four physicians. While only the physicians' testimony went directly to the issue of the standard of care, the pharmacologist's testimony aided the jury's understanding of the issues discussed by the physicians. The jury instruction to consider the pharmacologist's testimony was proper.
Dr. Hightower argues that the trial court erred by instructing the jury that it could consider the book The Physician's Desk Reference ("PDR") as to the issue of the standard of care and whether Dr. Hightower met that standard of care. In that connection, he argues that the PDR is "not authoritative" and, therefore, should not have been considered by the jury. As discussed above, the trial court instructed the jury that they could consider the decision of the medical review panel, the expert testimony of the four physicians and the pharmacologist and the medical literature which was discussed by the expert witnesses (which medical literature included the PDR).
The PDR is a compilation of drug manufacturers' drug package inserts. It contains information about many drugs one of which is Tensilon. Each of the expert witnesses (including Dr. Hightower himself) discussed the PDR. During the course of the expert testimony, the PDR section on Tensilon was discussed in some detail. The trial court noted on the record that Dr. Hightower's counsel did not object to the PDR being introduced into evidence or to plaintiff's counsel referring to the PDR in closing arguments. Thus, we are concerned with only a jury instruction and not with an evidentiary objection.[7]
We are unpersuaded by Dr. Hightower's argument that the jury should not have been instructed to consider the PDR because the PDR is not "authoritative". There was medical testimony that the PDR is relied upon by physicians with regard to drugs. More particularly, there was medical testimony that physicians do rely upon the PDR for information about drugs although they do not allow it to dictate their practice.
Dr. Barnes testified that the PDR lists dosages, side effects, basic descriptions and recommended usages for drugs and that it is generally used by physicians as a reference for proper dosages and for possible side effects. He further explained that physicians use the PDR "as a reference guide to make decisions on how to prescribe medicines and what dosages to use, what contraindications there may be, and how to treat any side effects the drug may cause". (emphasis added). In particular, he would expect the PDR, which is published annually, to have the most up-to-date information on Tensilon. However, he testified, physicians do not invariably follow the PDR exactly.
Thus, we think enough of a showing was made as to the reliability of the PDR, at least with respect to Tensilon, that it was proper for the trial court to instruct the jury that they could consider the PDR along with the medical review panel decision, the expert testimony and the other medical literature discussed by the expert witnesses. The trial *1111 court did not instruct the jury that it must consider the PDR, but only that it could consider the PDR, so the jury was free to disregard the PDR if it found Dr. Hightower's testimony or other evidence more persuasive. Also, the trial court did not give the PDR undue emphasis, or indeed any unusual prominence at all, when it instructed the jury as to various evidence that could be considered. Thus, again, the jury was free to disregard the PDR if it found Dr. Hightower's testimony or other evidence more persuasive. The jury instruction was proper.
Dr. Hightower argues that the trial court erred by admitting into evidence a Suspected Adverse Drug Reaction form that was filled out and signed by a UMC nurse, Lilly Reed, R.N., some time after the May 11, 1990 arrest. However, the record reflects that, when the form was introduced into evidence, as plaintiff's Exhibit 9, Dr. Hightower's counsel stated on the record that he had "no objection". Thus, counsel may not complain on appeal about the admission into evidence of the exhibit. La.Code Evid. art. 103(A)(1); La.Code Civ.Proc. art. 1635.
Dr. Hightower and nurse Nixon argue that the trial court erred by failing to instruct the jury as to intervening cause. The gist of their argument is that Ms. Roussell suffered an arrest and ultimately died, not from an adverse reaction to Tensilon, but from a stroke. There was some conflict at trial as to whether Ms. Roussell's arrest was caused by a stroke rather than by Tensilon. The defendants' theory was that Ms. Roussell's arrest was not caused at all by an adverse reaction to Tensilon and that, instead, she happened to suffer a stroke soon after the Tensilon test. There was no argument that Ms. Roussell's arrest was caused by both Tensilon and a stroke. Thus, there was presented a straightforward issue of whether the Tensilon was a cause-in-fact of the arrest. The trial court instructed the jury as to cause-in-fact and the defendants do not complain of that instruction. No issue of intervening cause was presented. The trial court did not err by declining to give an instruction as to intervening cause.
Nurse Nixon argues (a) that the only evidence that Tensilon caused Ms. Roussell's arrest was the testimony of the pharmacologist and that (b) a pharmacologist, not being a medical doctor, is not competent to testify as to the question of whether Tensilon caused the arrest. However, as we have discussed in detail above, the expert testimony of Dr. Weisberg and Dr. Barnes was that, if Ms. Roussell's pulse was 58 at 7:55 p.m., then there probably was cardiac involvement in the adverse reaction to Tensilon. Thus the pharmacological testimony was not the only testimony that the Tensilon caused the arrest. Further, when an objection was made as to the pharmacologist's competence to testify as to the causation issue, he specifically testified that the question is within his expertise. In particular, he explained that "the action of drugs in correlation with the clinical signs of patients are part of my training, experience and practice". Also, his testimony as to causation was testimony about the effects of a drug, clearly his area of expertise, and not testimony about the proper treatment of patients, which is a physician's area of expertise.
Nurse Nixon argues that there was no evidence that she deviated from the standard of care for nurses or that any such deviation by her caused Ms. Roussell's injuries. However, nurse Dawes, R.N., testified that, if Ms. Roussell's pulse rate was 58 at 7:55 p.m., then she was bradycardic and needed monitoring very closely for at least 30 minutes. It is undisputed that nurse Nixon left Ms. Roussell at 7:55 p.m. Thus, there was evidence that nurse Nixon deviated from the standard of care for nurses. Also, nurse Dawes testified that, if Ms. Roussell had been closely monitored between 7:55 p.m. and 8:25 p.m., then it would have increased her chances of survival. Thus, there was evidence that nurse Nixon's deviation from the standard of care contributed to Ms. Roussell's injuries.
Nurse Nixon argues that the jury's award of $180,000 to Yvonne Cagnolatti for the death of her mother and the jury's award of $50,000 for Ms. Roussell's loss of chance of survival, were excessive. We may review these awards of general damages only for an *1112 abuse of discretion. Moreover, the jury's discretion as to general damages awards is "vast". Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994); Theriot v. Allstate Ins. Co., 625 So.2d 1337 (La.1993).
Ms. Roussell lived with her daughter, Ms. Cagnolatti, and had done so for some years. After Ms. Roussell went into a coma, Ms. Cagnolatti took a leave of absence from her work and visited her mother every day for about seventy days, which is evidence of the closeness of their relationship. We do not find that the $180,000 award is an abuse of the jury's much discretion.
While Ms. Roussell was in a coma, it was discovered that she had a life-threatening lung cancer. Also, she may have had other health problems as well. Thus, nurse Nixon and UMC argue that Ms. Roussell's future prognosis was poor and that, therefore, the $50,000 for loss of chance of survival was excessive. However, the medical testimony as to Ms. Roussell's prognosis absent the arrest was mixed. Dr. Barnes, one of her treating physicians, testified that the cancer had never been "staged" (presumably, meaning that the stage of cancer was never determined) and that he was uncertain as to her life expectancy. In any case, an award of $50,000 is fairly modest for a death case. We do not believe that it was an abuse of discretion.
The plaintiff appeals a technicality of the trial court's judgment. The trial court's original judgment, signed November 10, 1994, held Dr. Hightower, nurse Nixon, UMC as nurse Nixon's employer, and the liability insurer of nurse Nixon and UMC liable in solido for $470,000. After a hearing on a number of postjudgment motions, the trial court signed an amended judgment of February 2, 1995 which (a) held Dr. Hightower liable for $100,000, (b) held nurse Nixon, UMC and the liability insurer for nurse Nixon and UMC liable in solido for $100,000 and (c) held the Louisiana Patient's Compensation Fund ("LPCF") liable for $270,000.
The plaintiff asserts, and the briefs of the defendants do not dispute, that all parties agree that, under the Louisiana Medical Malpractice Act, the personal liability of Dr. Hightower is limited to $100,000 and the personal liability of nurse Nixon (and UMC and their insurer) is limited to $100,000 and that the $270,000 balance of the $470,000 judgment should ultimately be paid by the LPCF. However, the plaintiff is concerned that, because the LPCF is to pay the amount for which the defendants are liable in excess of $100,000, and the February 2, 1995 judgment literally holds the defendants liable for only $100,000 each, it might be argued that there is no judgment in excess of $100,000 to be paid by LPCF. The briefs of the defendants do not contest this. Also, the plaintiff asserts that the LPCF should not be cast in judgment. The briefs of the defendants do not contest this point either.
Out of an abundance of caution, we will AMEND the judgment of the trial court to hold the defendants liable in solido for $470,000 subject to the statutory limit of personal liability of $100,000 of Dr. Hightower and $100,000 of nurse Nixon and her employer, UMC, and the insurer of nurse Nixon and UMC, St. Paul Fire and Marine Insurance Company. As the LPCF is not a party to this action, we will also AMEND the judgment to delete any judgment against LPCF. There is a statutory procedure, La. R.S. 40:1299.44.B, for collecting the $270,000 balance of the $470,000 judgment from LPCF and we assume it will be followed. As so amended, the judgment of the trial court is affirmed as amended.
AMENDED, AFFIRMED AS AMENDED.

ORDER
ARMSTRONG, Judge.
We grant partial rehearing to consider the trial court's JNOV which reallocated fault from 30% Dr. Hightower and 70% Nurse Nixon/University Medical Center to 50% Dr. Hightower and 50% Nurse Nixon/University Medical Center. If the weight of the evidence was such that the jury's allocation of fault was reasonable, then the JNOV should not have been rendered. Allocation of fault is an issue of fact and the *1113 decision of the jury, as the finder of fact, should not have been disturbed so long as it was reasonable in light of the record as a whole. E.g. Clement v. Fry, 95-1119 (La.1/16/96), 666 So.2d 607. In the present case, there was expert testimony by a nurse to the effect that Nurse Nixon did not meet the standard of care applicable to her as to monitoring of the patient. Also, the jury reasonably could have concluded that the focus of the fault and/or causation in this case was lack of monitoring, rather than the choice of medication, and the monitoring was somewhat more the responsibility of the nurse than the doctor. Thus, the jury's allocation of fault was reasonable and should not have been disturbed by the JNOV. Consequently, we VACATE the JNOV and reinstate the jury's allocation of fault 30% to Dr. Hightower and 70% to Nurse Nixon/University Medical Center.
AMENDED; AFFIRMED AS AMENDED.
NOTES
[1] Dr. Hightower testified that, prior to the test, he wrote in the chart that 10 milligrams of Tensilon was "given". But, he also testified that, in fact, he administered only 3.5 milligrams of Tensilon before discontinuing the test. Further, he testified that after the test, but still on May 11, 1990, he wrote an additional note in the chart that 4.5 milligrams was given. Lastly, he testified that, on a later date, he realized that 4.5 milligrams was an error and he wrote an additional note that 3.5 milligrams had been given. This led to some controversy at trial as to how much Tensilon was administered. However, none of the medical testimony indicates that the exact amount of Tensilon administered made any difference in this case.
[2] At the time of trial, the two nurse's aides were no longer employed at UMC. No party was able to locate the two nurse's aides and so they testified neither by deposition or at trial.
[3] The record reflects that the handwriting expert, Robert T. Foley, has extensive training, experience and other qualifications in the field of forensic document examination. He trained for two years full-time at the Georgia State Crime Laboratory and also received training at the FBI Academy and at Georgetown University. He has a Master's degree in criminal justice and a law degree. He has passed written, verbal and practical examinations to be admitted to the American Society of Questioned Document Examiners. He has served for many years as a forensic document examiner for the Crime Laboratory of Louisiana. He also has served as a forensic document examiner for the Louisiana Attorney General, the Louisiana Department of Labor, the AFTD, the U.S. Secret Service, the U.S. Department of Defense, the U.S. Customs Service and other federal agencies. He has published and lectures in the field of forensic document examination.
[4] The trial judge entered judgment notwithstanding the verdict allocating fault 50% to Dr. Hightower and 50% to nurse Nixon. No party has appealed this point so we express no opinion as to it.
[5] Dr. Weisberg also testified that, if the pulse rate had descended to 52, he would have administered Atropine. Dr. Barnes testified that, most likely, the pulse rate would have spiralled down from 58 at 7:55 p.m. to complete arrest by 8:25 p.m. (as opposed to an abrupt arrest at about 8:25 p.m.). Thus, most likely, if Ms. Roussell's pulse had been monitored closely then, at some point it would have been determined to be 52, and Atropine should have been administered. This is a further causal link between Dr. Hightower's treatment and the arrest.
[6] Dr. Hightower testified that, presumably about 7:55 p.m., he ordered nurse Nixon to take Ms. Roussell's vital signs in 15 minutes. Nurse Nixon denied that there was any such order and no such order was written in the chart. Thus, the jury could reasonably have resolved this credibility issue against Dr. Hightower. But, in any case, this issue is not material, because taking Ms. Roussell's vital signs once, 15 minutes after 7:55 p.m., would not have constituted the close monitoring described by Dr. Weisberg and Dr. Barnes.
[7] Dr. Hightower's counsel apparently did object to the PDR going into the jury room for the jury's deliberations and, apparently, the PDR did not go into the jury room. This was in accordance with Article 803(18) of the Louisiana Code of Evidence.