No. 97,971

SUSAN E. PUCKETT, Individually, as Heir at Law, and as Special Administrator of the Estate of RONALD E. PUCKETT, Deceased, *Appellant*, v. MT. CARMEL REGIONAL MEDICAL CENTER, BARBARA DERUY, A.R.N.P., and ADAM S. PAONI, D.O., *Appellees*.

(228 P.3d 1048)

408

Opinion filed April 22, 2010.

*Zackery E. Reynolds*, of The Reynolds Law Firm, P.A., of Fort Scott, argued the cause and was on the briefs for appellant.

*Lawrence J. Logback*, of Holbrook & Osborn, of Overland Park, argued the cause and was on the briefs for appellees Mt. Carmel Regional Medical Center and Barbara Deruy, A.R.N.P.

*Blake Hudson*, of Hudson & Mullies, L.L.C., of Fort Scott, argued the cause, and *Leigh C. Hudson*, of the same firm, was with him on the briefs for appellee Adam S. Paoni, D.O.

The opinion of the court was delivered by

LUCKERT, J.: On petition for review, the defendants in this medical malpractice case seek reversal of the Court of Appeals' determinations that the trial court erred by instructing the jury on intervening cause, the error was not harmless, the jury verdict rendered in the defendants' favor must be vacated, and the case remanded for retrial. See *Puckett v. Mt. Carmel Reg. Med. Center*, No. 97,971, unpublished opinion filed September 19, 2008. We affirm the Court of Appeals' decision, reverse the jury verdict, and remand the case with directions for a new trial.

## FACTUAL AND PROCEDURAL BACKGROUND

On June 15, 2002, Ronald E. Puckett sought treatment for severe back pain at the emergency room of Mt. Carmel Regional

Medical Center (Mt. Carmel) in Pittsburg, Kansas. Ronald was seen by Dr. Ronald Seglie, who examined him and prescribed pain medication and a muscle relaxer.

Four days later, Ronald still had pain in his lower back and was also running a fever. He sought treatment at a clinic operated by Mt. Carmel where he was treated by Barbara Deruy, an advanced registered nurse practitioner (A.R.N.P.), who worked at the clinic under a collaborative practice agreement that required a supervising physician be within 50 miles. Nurse Deruy had previously treated Ronald for chronic back pain when she worked for his family doctor. When Ronald arrived at the clinic, Nurse Deruy noted that Ronald was moving very slowly and with great difficulty. Ronald indicated he had been running a fever that morning, but his chief complaint was the back pain. He had taken some medication containing acetaminophen before seeing Nurse Deruy and did not have a fever at the time of his visit. Nurse Deruy observed Ronald's reddened ears and throat, as well as nasal congestion, which she attributed to a viral infection, and made a differential diagnosis of low back pain and a viral syndrome. Nurse Deruy changed Ronald's prescription muscle relaxant and told him to report to the emergency room if his symptoms got worse.

Ronald's symptoms did worsen over the next 2 days; he became confused and disoriented. On June 21, 2002, he was transported by ambulance to Hospital District No. 1 (Girard Hospital), was admitted, and was placed in the intensive care unit under the treatment of Dr. Adam Paoni, a board-certified physician in the area of family practice. Following a regimen of antibiotics to treat a urinary tract bacterial infection, Ronald initially improved. Unfortunately, his condition soon deteriorated and he developed respiratory distress. On June 23, 2002, Dr. Paoni transferred Ronald to St. John's Hospital (St. John's) in Joplin, Missouri, a larger "tertiary care" facility, where he could receive more specialized care, including long-term respiratory assistance, for sepsis that had developed from the bacterial infection.

At St. John's, Ronald was placed under the care of Dr. Habib Munshi, a physician board certified in the areas of pulmonary diseases, critical care medicine, and sleep disorders. Dr. Munshi de-

scribed Ronald's status as *"in extremis,"* meaning his whole system was severely unstable, the situation was "very critical," and he was at considerable risk of dying. Dr. Munshi stated at trial that considering the fact that Ronald "had several days of treatment and he still was in this situation, his prognosis for recovery was not very good." Ronald's white blood cell count was high, his heart rate was elevated, and he had severe respiratory problems. Dr. Munshi had to choose a method of providing respiratory assistance. He treated Ronald's respiratory distress with a bilevel positive air pressure (BiPAP) face mask rather than a ventilator, since he believed Ronald's medical condition was too perilous to attempt the intubation required if a ventilator was utilized. Dr. Munshi testified that Ronald had no contraindication to the use of the BiPAP mask.

On the morning of June 25, 2002, Dr. Munshi visited Ronald, who remained critically ill. For medical reasons and patient comfort, Dr. Munshi ordered the temporary removal of the BiPAP mask and the use of an oxygen mask. While the BiPAP mask was removed, Ronald sat up in bed and ate some breakfast. After approximately 3 hours, Ronald was placed back on the BiPAP mask. Soon thereafter Ronald went into cardiac arrest. Ronald had stopped breathing after having vomited and aspirated. His cardiac and pulmonary functions were restored, but he never fully regained consciousness.

Ronald died on August 6, 2002. The death certificate listed Ronald's cause of death as "anoxic encephalopathy," which basically means "there was a disease process of the brain that . . . resulted from lack of oxygen to the brain." Significant conditions listed as contributing to his death were sepsis, diabetes, and respiratory failure. At trial, Dr. Munshi opined that despite Ronald's receiving low oxygen, he would have expected him to recover but because of "underlying primary insults"—severe sepsis and major organ failure—his "coding" was "part of the underlying process."

Susan E. Puckett, the widow and special administrator of Ronald's estate, brought wrongful death and survivor actions against Mt. Carmel, Nurse Deruy (Mt. Carmel and Nurse Deruy will be referred to collectively as Nurse Deruy), and Dr. Paoni on the basis of medical malpractice. Susan alleged that Nurse Deruy was neg-

ligent in (1) failing to properly diagnose and treat Ronald's urinary tract infection that developed into sepsis after going untreated; (2) failing to obtain and review Ronald's medical chart; (3) failing to order a complete blood count and urinalysis; (4) failing to obtain a proper history; and (5) practicing outside her specialty. Susan alleged that Dr. Paoni was negligent in (1) failing to realize the severity of Ronald's condition; (2) failing to realize Ronald was having, or was at risk of having, multiple-system organ failure that could not be treated at Girard Hospital; and (3) failing to timely transfer Ronald to a facility where he could receive more specialized care.

In response, both Nurse Deruy and Dr. Paoni denied individual fault and raised the affirmative defense of comparative fault between the parties and Dr. Munshi. They alleged that Dr. Munshi, who is not a Kansas resident and is not a party to this lawsuit, was at fault for placing Ronald on the BiPAP mask instead of a ventilator. More specifically, they claimed Dr. Munshi failed to provide ventilation with a secure airway, resulting in Ronald's vomiting, aspirating, and cardiac arrest that led to his death. In the alternative, Nurse Deruy and Dr. Paoni claimed there was a superseding, intervening cause, which they now characterize as the "aspirating event," that relieved them of any liability.

The trial became a battle of the experts. Dueling opinions were admitted regarding whether Nurse Deruy and Dr. Paoni violated their respective standards of care and also whether Dr. Munshi was negligent. In addition, many of the experts offered opinions relating to causation, some suggesting Nurse Deruy's and Dr. Paoni's negligence caused or exacerbated Ronald's sepsis and others suggesting the severity of his illness was not the result of their actions or inactions. Primarily, the various defense expert opinions related to two of the defense theories—that Nurse Deruy and Dr. Paoni did not deviate from their applicable standards of care and that any negligence was attributable to Dr. Munshi or, at least, his negligence had to be compared to the negligence of Nurse Deruy and Dr. Paoni, if any. Other opinions related to Nurse Deruy's and Dr. Paoni's final theory of defense, *i.e.*, whether a superseding, intervening event caused Susan's damages.

As to the intervening cause defense, Ronald's treating physician at the time of death testified that Ronald's aspiration caused his anoxic brain injury and cardiac arrest. Plaintiff's expert, Dr. Larry Rumans, gave similar testimony. In addition, Nurse Deruy's and Dr. Paoni's experts focused on the aspiration event as the cause of death. For example, one of Dr. Paoni's expert's, Dr. David Mc-Kinsey, opined that Ronald's death "resulted from complications of aspiration" and "the reason he aspirated is he had a whole lot of fluid in his stomach and I can't blame that on the sepsis." Dr. McKinsey further opined that had Ronald not aspirated at St. John's, it was more likely than not he would have survived.

Another defense expert, Dr. Wade Williams—board certified in the areas of internal, pulmonary, and critical care medicine—opined that Dr. Paoni's treatment of Ronald met the applicable standard of care but Dr. Munshi's did not. Specifically, in his opinion, Dr. Munshi should have intubated Ronald and placed him on a ventilator. Dr. Williams addressed causation as well, observing it was foreseeable that a patient with sepsis would need respiratory assistance. Nevertheless, Dr. Munshi had a choice of using a positive air pressure (PAP) device or intubation and, although PAP is used "quite often," it was not an appropriate treatment for Ronald, in Dr. Williams' opinion. Dr. Williams believed it was "fairly unlikely" that Ronald's sepsis led to his vomiting and aspiration. Rather, Dr. Williams stated that the use of the BiPAP mask caused pressure resulting in gastric distention and vomiting. Dr. Williams thought Ronald would not have suffered brain injury and death if he had been placed on a ventilator; it was an "iatrogenic complication," i.e., a medically induced complication, that ultimately resulted in Ronald's cardiac arrest. Nevertheless, Dr. Williams also testified that the use of BiPAP treatment is fairly common and is also fairly common in situations where patients have eaten.

Based on the opinions regarding Dr. Munshi's negligence in placing Ronald on the BiPAP mask and the causal relationship that decision had in Ronald's death, Nurse Deruy and Dr. Paoni proposed both comparative negligence and intervening cause jury instructions. They contended the intervening cause instruction was proper because the jury could have found they were negligent and

still have concluded that Ronald's aspiration constituted an independent intervening cause, breaking the causal connection between Nurse Deruy's and Dr. Paoni's alleged negligence and Ronald's death. Over Susan's objection, the trial court instructed the jury on intervening cause, finding this was a case where "there could very well be an intervening cause[,] and that intervening cause is [that Ronald] aspirated in his mask due to the negligence of Dr. Munshi or not due to the negligence of Dr. Munshi." The trial court further indicated that, in this case, foreseeability was a matter of law.

After brief deliberations, the jury returned a verdict in favor of Nurse Deruy and Dr. Paoni, and Susan appealed. She contended the trial court erred in instructing the jury, in the jury selection process, and in refusing to admit standard of care testimony from Nurse Deruy.

### COURT OF APPEALS

The Court of Appeals found error in the trial court's decision to give an intervening cause instruction and found that error to be reversible. In reaching this conclusion, the Court of Appeals cited Kansas cases that indicate intervening cause cuts off liability for earlier negligence only in "extraordinary" cases. *Puckett*, slip op. at 9. The Court of Appeals noted that "[i]f the original actor reasonably should have foreseen the intervening act in light of the attendant circumstances, the original actor's negligence remains a proximate cause of the injury. [Citation omitted.]" *Puckett*, slip op. at 9. Applying this principle, the Court of Appeals focused on the issue of whether Dr. Munshi's alleged negligence was reasonably foreseeable by Nurse Deruy and Dr. Paoni.

Finding that the evidence established that respiratory problems commonly result from sepsis, the Court of Appeals concluded it was foreseeable that Ronald would develop respiratory difficulties if untreated. Also foreseeable was the fact that a later treating physician would elect the BiPAP mask among various methods in assisting Ronald. Given the extraordinary nature of an intervening cause case, the Court of Appeals examined the expert medical testimony to determine if the evidence showed that Dr. Munshi's care

of Ronald was not only negligent, but also "so beyond the pale that it would not be foreseeable by Ronald's earlier medical providers." *Puckett*, slip op. at 11. According to the Court of Appeals, there was expert testimony that Dr. Munshi breached the applicable standard of care; however, no defense expert opined that Dr. Munshi's care was so deficient that it could not have been anticipated. Because there was "no evidence that Dr. Munshi's actions were so extraordinary or unusual as to break the causal connection between the claimed negligence of Nurse Deruy and Dr. Paoni and Ronald's eventual death," the panel concluded that this was not a case of intervening cause. *Puckett*, slip op. at 11.

The Court of Appeals rejected Nurse Deruy's and Dr. Paoni's alternative argument that even if it was error to instruct the jury on intervening cause, the error was harmless because the jury found no fault on the part of either defendant. The Court of Appeals pointed out that the concept of an intervening cause had no bearing on the claims made in the survivor action. The survivor action dealt with the issue of injuries and damages suffered by Ronald *before* his transfer to Dr. Munshi's care at St. John's. Yet the verdict form failed to distinguish the survivor action (brought by Susan as administrator of Ronald's estate) from the separate wrongful death action (brought by Susan as heir at law), and the parties failed to distinguish the separate claims of wrongful death and survivorship in their closing arguments.

With respect to the survivor action, the Court of Appeals observed that if the jury found either Nurse Deruy or Dr. Paoni negligent but also found that the intervening negligence of Dr. Munshi broke the causal connection between the negligence and Ronald's death, there was no way for the jury to enter a judgment in favor of Susan for any injuries or damages Ronald sustained before being transferred to St. John's. Rather, the verdict form was set up so that the jury had to first answer whether either Nurse Deruy or Dr. Paoni was at fault, and only if the question was answered in the affirmative was the jury to proceed in comparing the fault of Nurse Deruy, Dr. Paoni, and Dr. Munshi. If the jury found there was an intervening cause, the jury would answer the first question in the negative, finding no fault on the part of either

Nurse Deruy or Dr. Paoni, and would not reach the issue of comparative fault. In fact, the jury did answer the first question in the negative.

With regard to the wrongful death claim, the Court of Appeals pointed out that the jury had to determine more than whether either Nurse Deruy or Dr. Paoni deviated from the applicable standards of care; they also had to determine whether those deviations brought about Ronald's death. Given that, the Court of Appeals emphasized there were three possible explanations for the jury's no-fault finding:

"(1) Neither Deruy nor Dr. Paoni breached the applicable standard of care, (2) Deruy and/or Dr. Paoni breached the applicable standard of care but did not cause Ronald's death, or (3) Deruy and Dr. Paoni breached the applicable standard of care but their fault was interrupted by the intervening negligence of Dr. Munshi who caused Ronald's death." *Puckett*, slip op. at 13.

Nurse Deruy and Dr. Paoni argued that there was evidentiary support for explanations (1) and (2), so the jury could have resolved the case without considering the intervening cause instruction. But the Court of Appeals found it impossible to determine whether the jury followed the intervening cause instruction when rendering its verdict or if the jury decided the case without reference to it. Consequently, the Court of Appeals concluded that the trial court's error in giving the intervening cause instruction was not harmless. *Puckett*, slip op. at 13-14.

Based on its ruling, the panel declared Susan's remaining issues moot and reversed and remanded the case for a new trial. *Puckett*, slip op. at 14.

## PETITION FOR REVIEW

Nurse Deruy and Dr. Paoni filed petitions for review, arguing that the trial court properly gave an intervening cause instruction because they raised alternate theories of defense—no fault, comparative fault, and intervening cause—which were supported by the evidence and required presentation to the jury. They contend that the Court of Appeals' decision essentially eliminates the possibility that a health care provider could ever simultaneously raise the alternate defense theories of comparative fault and intervening

cause. In addition, Nurse Deruy and Dr. Paoni contend that the trial court did not err by giving a jury instruction on intervening cause because there was sufficient material evidence to support the intervening cause defense. They argue that in concluding the case did not fit the theory of an intervening cause and finding reversible error in the giving of an intervening cause instruction, the Court of Appeals failed to address one nuance of their intervening cause defense theory—specifically, that the aspiration event, triggered by *nonnegligent* actions of Dr. Munshi, was the intervening cause of Ronald's death. Thus, Nurse Deruy and Dr. Paoni contend the Court of Appeals failed to "comprehend" their alternate defense theories and issued an erroneous decision. Nurse Deruy and Dr. Paoni also argue, in the alternative, that giving an intervening cause instruction in this case was harmless, if it was error.

Susan contends the alternative defense of nonnegligent intervening cause was not argued. The record reveals, however, that Nurse Deruy and Dr. Paoni raised three alternate theories of defense—no fault, comparative fault, and intervening cause—during the closing arguments, and the trial court recognized the intervening cause theory as being based on assertions of negligent conduct by Dr. Munshi and on nonnegligent conduct. We know this because the trial court, when ruling on Susan's objection to the intervening cause instruction, stated, "[T]here could very well be an intervening cause[,] and that intervening cause is [that Ronald] aspirated in his mask due to the negligence of Dr. Munshi or not due to the negligence of Dr. Munshi."

Regardless, Susan also counters that the Court of Appeals correctly applied the law in finding there was no factual basis on which to give an intervening cause instruction. She urges this court to affirm the Court of Appeals' decision.

This court's jurisdiction arises from K.S.A. 20-3018(b).

## STANDARD OF REVIEW

Two standards are implicated by the issues raised in our review of the Court of Appeals' decision. The threshold standard is the one used by the trial court to determine whether a jury instruction

should be given. The second standard applies to an appellate court's review of the trial court's decision regarding whether to give an instruction. In discussing these standards, the parties cite several versions, each supported by case law of this court.

Under one variation of the standard for a trial court's determination of whether to give an instruction, some cases broadly indicate a court must instruct the jury on a party's theory of the case. *E.g.*, *Wood v. Groh*, 269 Kan. 420, 423, 7 P.3d 1163 (2000). Under another variation, this court has indicated an instruction is warranted only if the party's theory is supported by evidence. *Natalini v. Little*, 278 Kan. 140, 146, 92 P.3d 567 (2004); *Cox v. Lesko*, 263 Kan. 805, 810, 953 P.2d 1033 (1998); *Guillan v. Watts*, 249 Kan. 606, 617, 822 P.2d 582 (1991); *Hunter v. Brand*, 186 Kan. 415, 419, 350 P.2d 805 (1960). Similarly, it has been stated a trial court should give an instruction if a party's theory is "supported by any *competent* evidence." (Emphasis added.) *Bechard v. Concrete Mix & Construction Inc.*, 218 Kan. 597, 600-01, 545 P.2d 334 (1976).

There is yet another variation that sets a slightly higher evidentiary standard. Under this standard, a trial court must instruct on a party's theory if " 'reasonable minds might reach different conclusions' " based on " 'the evidence and all inferences that may reasonably be drawn therefrom.' " *Pizel v. Whalen*, 252 Kan. 384, 387-88, 845 P.2d 37 (1993). In essence, the *Pizel* court applied a standard of whether judgment could be rendered on the issue as a matter of law, stating the evidence must be " 'accepted as true and considered in the light most favorable' " to the party asserting the theory. *Pizel*, 252 Kan. at 388 (comparing to summary judgment standard). Such a standard is consistent with that for a motion for judgment as a matter of law (directed verdict), lending consistency to the trial court's role in determining what issues should be presented to the jury. See K.S.A. 60-250 (judgment as a matter of law); *Smith v. Kansas Gas Service Co.*, 285 Kan. 33, 40, 169 P.3d 1052 (2007) (motion for judgment as a matter of law must be denied " ' "[w]here reasonable minds could reach different conclusions based on the evidence" ' "); *cf.* K.S.A. 22-3414(3) (instruction required in criminal case if there "is some evidence which would reasonably justify a conviction of some lesser included crime");

*State v. Anderson*, 287 Kan. 325, 332-33, 197 P.3d 409 (2008) (duty to instruct on affirmative defense arises where there is evidence which, viewed in the light most favorable to the defendant, is sufficient to justify a rational factfinder finding in accordance with the defendant's theory); *State v. Boyd*, 281 Kan. 70, 93, 127 P.3d 998 (2006) (same standard when lesser included offense requested).

As we consider these variations of the standard for giving an instruction on a party's theory in a civil case, we conclude *Pizel's* holding is a more complete and accurate statement. *Pizel*, 252 Kan. at 387-88. We, therefore, clarify the standard and hold that a trial court is required to give an instruction supporting a party's theory if the instruction is requested and there is evidence supporting the theory which, if accepted as true and viewed in the light most favorable to the requesting party, is sufficient for reasonable minds to reach different conclusions based on the evidence.

The next question is: What standard applies when an appellate court reviews the trial court's determination? The first consideration is whether there was an objection to the giving or failure to give an instruction. If there was not, the objection is waived unless the instruction is clearly erroneous. K.S.A. 60-251(b). Here, Susan made a timely and specific objection.

Given this determination, we turn to *Cox*, where this court cited *Pizel* in concluding an appellate court applies the same standard as a district court when considering whether an instruction should be given on a party's theory of the case. *Cox*, 263 Kan. at 812 (citing *Pizel*, 252 Kan. at 388). The *Cox* court also stated: "Even though the evidence supports the giving of an instruction, such an instruction must accurately and fairly state the law as applied to the facts of the case. This is a question of law, and we have unlimited review over such matters." *Cox*, 263 Kan. at 810-11.

We must apply these standards to the parties' arguments which implicate questions of whether the intervening cause instruction fairly reflected the law and whether it should have been given under the facts of the case. We begin our discussion with the question of whether the instructions fairly reflected the law. In turn, this discussion will frame our consideration of whether the instruction should have been given under the facts of this case.

LAW RELATED TO CAUSATION AND INTERVENING CAUSE

In order to establish a claim based on medical malpractice, a plaintiff must establish: (1) The health care provider owes the patient a duty of care and was required to meet or exceed a certain standard of care to protect the patient from injury; (2) the health care provider breached this duty or deviated from the applicable standard of care; (3) the patient was injured; and (4) the injury proximately resulted from the health care provider's breach of the standard of care. See *Hale v. Brown*, 287 Kan. 320, 322, 197 P.3d 438 (2008); *Esquivel v. Watters*, 286 Kan. 292, 296, 183 P.3d 847 (2008).

The focus of this appeal is the fourth element—proximate cause. Kansas follows the traditional concept of proximate cause, *i.e.*, "[i]ndividuals are not responsible for all *possible* consequences of their negligence, but only those consequences that are *probable* according to ordinary and usual experience." *Hale*, 287 Kan. at 322; accord *Sly v. Board of Education*, 213 Kan. 415, 424, 516 P.2d 895 (1973); *Hickert v. Wright*, 182 Kan. 100, 108, 319 P.2d 152 (1957). Kansas appellate courts have consistently defined "proximate cause" as that cause which " ' " 'in natural and continuous sequence, unbroken by an efficient intervening cause, produces the injury and without which the injury would not have occurred, the injury being the natural and probable consequence of the wrongful act.' " ' [Citation omitted.]" *Idbeis v. Wichita Surgical Specialists*, 285 Kan. 485, 499, 173 P.3d 642 (2007).

This traditional statement of proximate cause incorporates concepts that fall into two categories: causation in fact and legal causation. See, *e.g.*, *Corder v. Kansas Board of Healing Arts*, 256 Kan. 638, 655, 889 P.2d 1127 (1994); *Hammig v. Ford*, 246 Kan. 70, 72, 785 P.2d 977 (1990). To prove causation in fact, a plaintiff must prove a cause-and-effect relationship between a defendant's conduct and the plaintiff's loss by presenting sufficient evidence from which a jury could conclude that more likely than not, but for the defendant's conduct, the plaintiff's injuries would not have occurred. See *Baker v. City of Garden City*, 240 Kan. 554, 559, 731 P.2d 278 (1987); *Weymers v. Khera*, 454 Mich. 639, 647-48, 563

N.W.2d 647 (1997); *Waste Management v. South Central Bell*, 15 S.W.3d 425, 430 (Tenn. App. 1997). To prove legal causation, the plaintiff must show that it was foreseeable that the defendant's conduct might create a risk of harm to the victim and that the result of that conduct and contributing causes were foreseeable. See *Yount v. Deibert*, 282 Kan. 619, 624-25, 147 P.3d 1065 (2006). The concept of "intervening cause" relates to legal causation and "does not come into play until after causation in fact has been established." *Waste Management*, 15 S.W.3d at 432; see also Prosser and Keeton, The Law of Torts § 44, p. 301 (5th ed. 1984) (recognizing the issue of intervening cause "does not arise until cause in fact is established").

An intervening cause is "one which actively operates in producing harm to another after the actor's negligent act or omission has been committed." Restatement (Second) of Torts § 441 (1964). An intervening cause absolves a defendant of liability only if it supersedes the defendant's negligence. In other words, the superseding and intervening cause "component breaks the connection between the initial negligent act and the harm caused." *Hale*, 287 Kan. at 324. But, one more factor—foreseeability—must be considered. "If the intervening cause is foreseen or might reasonably have been foreseen by the first actor, his negligence may be considered the proximate cause, notwithstanding the intervening cause. [Citation omitted.]" *Miller v. Zep Mfg. Co.*, 249 Kan. 34, 51, 815 P.2d 506 (1991).

All of these concepts are incorporated into the Pattern Instructions for Kansas (PIK), specifically PIK Civ. 4th 104.03, which was given in this case as Instruction 11:

"Instruction 11

"If an injury arises from two distinct causes which are independent and unrelated, then the causes are not concurrent. Consideration then must be given to the question of whether the causal connection between the conduct of the party responsible for the first cause and the injury was broken by the intervention of a new, independent cause which acting alone would have been sufficient to have caused the injury. If so, the person responsible for the first cause would not be at fault. If, however, the intervening cause was foreseen or should reasonably have been foreseen by the person responsible for the first cause, then such person's

conduct would be the cause of the injury, notwithstanding the intervening cause, and he or she would be at fault."

See *Tinkler v. United States by F.A.A.*, 982 F.2d 1456, 1467 (10th Cir. 1992) (citing PIK Civ. 2d 5.03 [now PIK Civ. 4th 104.03] as the proper standard in Kansas for determining when an intervening cause is a superseding cause).

The parties' arguments do not attack these well-settled principles but raise questions about how these principles mesh with comparative negligence. Specifically, Nurse Deruy and Dr. Paoni argue the Court of Appeals' analysis is contrary to comparative fault principles.

*Intervening Cause and Comparative Negligence*

First, Nurse Deruy and Dr. Paoni ask us to determine whether intervening cause—a common-law liability shifting device—continues to be valid when Kansas' comparative negligence statute—another form of a liability shifting device—applies. They contend that the Court of Appeals' decision alters these principles and, in effect, prohibits defendants from simultaneously raising the affirmative defense of intervening cause and the defense of comparative fault. We disagree with Nurse Deruy's and Dr. Paoni's proposition that the Court of Appeals established such a narrow rule of law. Instead, the Court of Appeals merely determined that the intervening cause doctrine did not apply under the facts of this case.

Moreover, in *Hale*, this court recently settled the question of whether the adoption of comparative negligence in Kansas rendered it unnecessary to determine whether a party's negligence was the proximate cause of injuries to a plaintiff. In so doing, the court rejected the contention that the legal proceeding, without regard to proximate cause, determines the percentage of causation attributable to the various parties. *Hale*, 287 Kan. at 321-23. Further, the *Hale* court rejected an expansive approach that would require a plaintiff to merely be able to prove that injury resulting from the defendant's conduct was foreseeable and that the defendant's conduct contributed to the injury. Such an approach, according to *Hale*, would greatly increase the number of potential

defendants in negligence actions and the affiliated litigation costs. *Hale*, 287 Kan. at 323-24. Instead, the court reiterated that " '[p]roximate cause is not an obsolete concept in Kansas law.' [Citation omitted.]" *Hale*, 287 Kan. at 323. Finally, the *Hale* court concluded that " '[i]ntervening and superseding causes, which cut off liability for earlier negligence, *are still recognized in extraordinary cases.*' [Citation omitted.]" (Emphasis added.) *Hale*, 287 Kan. at 323; see also *Godbee v. Dimick*, 213 S.W.3d 865, 884 (Tenn. App. 2006) (" '[T]he superseding cause doctrine can be reconciled with comparative negligence. Superseding cause operates to cut off the liability of an admittedly negligent defendant, and there is properly no apportionment of comparative fault where there is an absence of proximate causation.' 1 T. Schoenbaum, Admiralty and Maritime Law § 5-3, pp. 165-166 [2d ed. 1994].").

In addition, intervening cause survives the adoption of comparative negligence because nonnegligent conduct can be an intervening cause. For example, intentional tortious conduct, criminal acts of third parties, and forces of nature can be intervening causes. See, *e.g.*, *Llewellyn v. City of Knoxville*, 33 Tenn. App. 632, 646-47, 232 S.W.2d 568 (1950) ("The intervening cause might be either a negligent or nonnegligent act of somebody else, an act of a child, a lunatic, or an act of God."); see generally, Schlosser, *Intervening-Cause Defense: Is It Still Viable Under Comparative Fault?*, 42 Res Gestae 16, 19 (July 1998) (discussing cases involving intervening actions that were nonnegligent or were negligent but unforeseeable).

Kansas precedent, bolstered by persuasive authority from other jurisdictions, leads to the conclusion that the existence of comparative fault in our state does not automatically preclude a party from simultaneously raising the theory of intervening cause.

*Fieser*

Next, Nurse Deruy and Dr. Paoni raise a question about the interplay of Kansas law regarding foreseeability and comparative negligence. This question arises in the context of Nurse Deruy's and Dr. Paoni's argument that the Court of Appeals erred in relying on *Fieser v. St. Francis Hospital & School of Nursing, Inc.*, 212

Kan. 35, 39, 510 P.2d 145 (1973), which they argue was legislatively overturned by the adoption of comparative negligence.

The Court of Appeals relied on *Fieser* for the proposition that a tortfeasor who caused the initial injury is liable for "any additional bodily harm resulting from normal efforts of third parties in rendering aid which the injury reasonably requires, irrespective of whether such acts are done in a proper or negligent manner." *Puckett*, slip op. at 10. The holding in *Fieser* reflects Restatement (Second) of Torts § 457 (1964), which states:

"If the negligent actor is liable for another's bodily injury, he is also subject to liability for any additional bodily harm resulting from normal efforts of third persons in rendering aid which the other's injury reasonably requires, irrespective of whether such acts are done in a proper or a negligent manner."

The defendants argue this view cannot be reconciled with comparative negligence principles and, as they correctly observe, *Fieser* predates the 1974 adoption of Kansas' comparative negligence statute, K.S.A. 60-258a; L. 1974, ch. 239, sec. 1. They further suggest that the more accurate statement under Kansas law, at least in comparative negligence cases, is reflected in PIK Civ. 4th 171.04, which reads:

"If plaintiff sustained personal injury as a result of defendant's negligence, then plaintiff may recover damages from defendant for any additional harm which resulted from the efforts of (other persons) (a treating physician) to render aid to plaintiff, so long as those efforts were not performed in a negligent manner."

The PIK committee's Notes on Use indicate the pattern instruction was revised from the precomparative negligence version by removing any reference to negligent actions, making the original tortfeasor liable for damages by a subsequent treating physician only if the subsequent treatment was not negligent. The committee explained:

"Before the advent of comparative fault, a negligent party could be held liable for original injuries aggravated by subsequent medical treatment irrespective of whether that treatment was done in a proper manner. *Fieser v. St. Francis Hospital & School of Nursing, Inc.*, 212 Kan. 35, 510 P.2d 145 (1973), and *Keown v. Young*, 129 Kan. 563, 283 P. 511 (1930).

"Under comparative fault, all parties to an occurrence must have their fault determined in one action. *Brown v. Keill*, 224 Kan. 195, 207, 580 P.2d 867 (1978).

"In *Teepak, Inc. v. Learned*, 237 Kan. 320, 699 P.2d 35 (1985), the Supreme Court applied the one-action rule to successive tortfeasors. Consequently it was necessary to limit this instruction to those situations wherein the additional harm was done in a non-negligent manner." PIK Civil 4th 171.04, Comment.

See *Dodge City Implement, Inc. v. Board of Barber County Comm'rs*, 288 Kan. 619, 632-37, 205 P.3d 1265 (2009) (discussing one-action rule).

We agree with the PIK committee's assessment that the adoption of comparative negligence requires a modification of the application of Restatement (Second) of Torts § 457 in cases where comparative negligence principles apply. But see *State v. Mays*, 277 Kan. 359, 378-81, 85 P.3d 1208 (2004) (although not citing Restatement § 457, applying same principles to hold it is not a defense to a charge of homicide that the alleged victim's death was contributed to or caused by negligence of attending physicians). As applied in a medical malpractice case, this means a negligent health care provider cannot be held solely liable for the negligent acts of subsequent treating health care providers whose negligence concurs in causing the injury. Rather, if the negligent actions of more than one health care provider combine to cause injury, the liability of the various health care providers must be allocated based on comparable fault. Any contrary language in *Fieser*, 212 Kan. 35, is disapproved and rejected.

*Foreseeability*

Nevertheless, the theoretical basis for Restatement § 457—that the potential of negligence by subsequent treating health care providers is foreseeable—is not altered by the application of comparative negligence. This concept was recently discussed in *Cramer v. Slater*, 146 Idaho 868, 204 P.3d 508 (2009).

In *Cramer*, 146 Idaho at 874, the Idaho Supreme Court observed that Restatement § 457 "generally applies to any subsequent medical negligence which is necessary to correct an original act of medical negligence, thereby making acts of subsequent medical negligence generally foreseeable." The court explained that in a comparative negligence situation, the Restatement rule should not be applied so as to impute liability arising from all subsequent

negligent acts onto the original negligent actor. Instead, the concurring acts of negligence should be analyzed by the jury under the state's comparative fault statute. But the court also noted that the concurring negligence does not relieve the original actor of all liability because the subsequent negligence is foreseeable. *Cramer*, 146 Idaho at 874-77; see *Hickey v. Zezulka*, 439 Mich. 408, 438, 487 N.W.2d 106 (1992) ("[W]here the defendant's negligence consists in enhancing the likelihood that the intervening cause will occur, [citation omitted], or consists in a failure to protect the plaintiff against the very risk that occurs, [citation omitted], it cannot be said that the intervening cause was not reasonably foreseeable.").

The reasoning of the Idaho Supreme Court's *Cramer* decision is persuasive and consistent with other courts that generally view the negligence of subsequent health care providers as a concurring, rather than intervening, cause. The Virginia case of *Williams v. Le*, 276 Va. 161, 662 S.E.2d 73 (2008), illustrates. There, the administrator and personal representative of a patient who died from a pulmonary embolism brought a medical malpractice action against the radiologist who, after diagnosing the patient with deep vein thrombosis, did not make direct communication with the patient's treating physician concerning the diagnosis. Instead, the radiologist only sent the physician a message via facsimile that contained test results showing the diagnosis, which the physician failed to read prior to the patient's death.

One defense raised by the radiologist was that the subsequent negligence of the patient's treating physician (in failing to check the diagnostic report) completely broke the chain of events between the radiologist's negligence and the patient's death. Based on that theory, the trial court gave an intervening cause instruction.

On appeal, the Virginia Supreme Court concluded that the trial court erred in giving the intervening cause instruction. The court pointed out that there may be more than one proximate cause of an event. In explaining that a subsequent proximate cause may or may not relieve a defendant of liability for his or her negligence, the court reiterated the following rule: " 'In order to relieve a defendant of liability for [a] negligent act, the negligence intervening

between the defendant's negligent act and the injury must so entirely supersede the operation of the defendant's negligence that it alone, without any contributing negligence by the defendant in the slightest degree, causes the injury.' [Citations omitted.]" *Williams*, 276 Va. at 167. Conversely, " 'an intervening cause does not operate to exempt a defendant from liability if that cause is put into operation by the defendant's wrongful act or omission.' [Citation omitted.]" *Williams*, 276 Va. at 167. The *Williams* court concluded that under the evidence in that case the radiologist had put the cause into operation because the communication problems began with his failure to make direct contact with the treating physician, a member of his team, or the patient. *Williams*, 276 Va. at 167.

Other jurisdictions have looked at multiple causation injuries and have also evaluated whether the first actor's negligent conduct actively and continuously operated to bring about harm to another under the principles stated in Restatement (Second) of Torts § 439 (1964), which provides:

"If effects of the actor's negligent conduct actively and continuously operate to bring about harm to another, the fact that the active and substantially simultaneous operation of the effects of a third person's innocent, tortious, or criminal act is also a substantial factor in bringing about the harm does not protect the actor from liability."

Numerous cases within a medical malpractice setting illustrate that a health care provider's negligence may act with the effects of care provided by subsequent providers to bring about harm for which the initial provider remains liable or, at least, comparatively liable. See *Brillant v. Royal*, 582 So. 2d 512, 523-24 (Ala. 1991) (finding that failure of second examining physician to diagnose patient's warning leak was not intervening cause relieving first physician of liability for his failure to diagnose patient's cerebral aneurysm); *Osborn v. Irwin Memorial Blood Bank*, 5 Cal. App. 4th 234, 253, 7 Cal. Rptr. 2d 101 (1992) (finding Restatement § 439 applicable because "[a] 'continuous' chain of cause and effect is manifest" where a boy received blood from blood bank's donor pool because blood bank misrepresented that directed donations were not available; the boy contracted AIDS because the blood

was contaminated, just as his parents feared it would be); *Schnebly v. Baker*, 217 N.W.2d 708, 730-31 (Iowa 1974), *overruled on other grounds Franke v. Junko*, 366 N.W.2d 536 (Iowa 1985) (finding laboratory's negligence in reporting blood results set stage for subsequent negligence of doctor's reliance on those results despite other conflicting results and, therefore, doctor's negligence was not superseding cause to laboratory's liability); *Rudeck v. Wright*, 218 Mont. 41, 51-52, 709 P.2d 621 (1985) (holding doctor is not relieved from liability for negligent act of leaving lap mat in patient following surgery because doctor's negligence "actively and continuously act[ed] to cause harm to his patient" along with the "active and substantially simultaneous negligent act of the nurses" in failing to account for lap mat); *Johnson v. Hillcrest Health Center, Inc.*, 70 P.3d 811, 819 (Okla. 2003) ("When a cause merely combines with another act to produce injury, or several events coincide to bring about a single injury, each negligent actor may be held accountable."); *Hawkins v. Walker*, 238 S.W.3d 517, 523-24 (Tex. App. 2007) (finding failure of other physician to diagnose patient's ectopic pregnancy did not constitute superseding cause of patient's death to relieve physician of liability for his negligence in failing to discover patient's condition); *Wilson v. Brister*, 982 S.W.2d 42, 45 (Tex. App. 1998) (finding summary judgment inappropriate where evidence supported the contention that physician was concurring cause of patient's suicide despite negligence of friend that gave patient the gun and bullets).

Kansas law is consistent with these cases. In fact, these principles were explained to the jury in this case in Instruction 10, which followed PIK Civ. 4th 104.02 and stated:

"There may be more than one cause of an injury; that is, there may be concurrent causes, occurring independently or together, which combine to produce the injury. A cause is concurrent if it was operative at the moment of injury and acted with another cause to produce the injury.

"Concurrent causes do not always occur simultaneously. One cause may be continuous in operation and join with another cause occurring at a later time.

"When the concurring negligence of two or more persons causes an injury, each such person is at fault.

"If the negligence of only one person is the cause of the injury, then he or she alone is at fault."

These principles were applied in *Cassity v. Brady*, 182 Kan. 381, 321 P.2d 171 (1958), a case with similar facts to those presented in this case. There, a patient with a dislocated knee and other injuries was seen by a physician at the Atchison County Hospital. The physician took X-rays and provided other treatment but did not treat the dislocated knee. Five days later, the patient was transferred to a hospital in Lawrence. A Lawrence physician also failed to promptly treat the patient's knee. Ultimately, the patient was left with permanent knee injuries allegedly caused by the delay in treatment. Defending the suit, the first physician argued his negligence was not the proximate cause of the injury because of the subsequent treatment offered in Lawrence. This court disagreed, concluding:

"The omission of the two defendants were so related in point of time and interwoven that the resultant injury to the plaintiff was such that the omission on the part of each continued up until the time or date of the injury. In our opinion, the omission of each of the defendants concurred in producing the resultant injury to the plaintiff." *Cassity*, 182 Kan. at 386.

Although the rules of joint and several liability discussed in that case have been altered by the adoption of comparative negligence, the principles of proximate cause have not. Hence, if negligent actions by one health care provider conjoin with other causes— whether the result of negligence or not—to bring about an injury, the health care provider may still be comparatively liable.

This does not mean that there cannot be an intervening cause, however. We agree with Nurse Deruy and Dr. Paoni that Restatement § 457 should not be read to totally eliminate the possibility of an intervening cause in a medical malpractice case, whether the alleged intervening cause is negligent or nonnegligent. Rather, as our Court of Appeals stated in *Barkley v. Freeman*, 16 Kan. App. 2d 575, 579, 827 P.2d 774 (1992): "The theory under which liability is continued in the initial tortfeasor is that it is foreseeable that the medical treatment could aggravate the initial injury. Our legal issue then becomes one of whether the later accident is foreseeable or is the result of an intervening act or cause." Nevertheless, as we have recognized in prior cases, it is only in extraordinary cases that there is an intervening cause. *Hale v. Brown*, 287 Kan. 320, 323,

197 P.3d 438 (2008) (citing *Reynolds v. Kansas Dept. of Transportation*, 273 Kan. 261, 269, 43 P.3d 799 [2002]).

The extraordinary nature of an intervening cause is illustrated in two Tennessee Court of Appeals cases relied on by Nurse Deruy and Dr. Paoni—*Godbee*, 213 S.W.3d 865, and *White v. Premier Medical Group*, 254 S.W.3d 411 (Tenn. App. 2007). Neither decision persuades us that an intervening cause instruction should have been given in this case.

In *Godbee*, the patient in a medical malpractice action challenged the trial court's decision to give a superseding cause instruction along with instructions regarding proximate cause and comparative fault. The patient had sued her orthopedic surgeon for his alleged negligence in failing to recognize her spinal stenosis and in performing the incorrect surgical procedure. She further alleged that the surgeon's negligence caused her to develop arachnoiditis, a condition involving hyperinflammation of the nerve roots.

The surgeon argued that evidence of the patient's preexisting disc degeneration and evidence of subsequently performed tests and procedures formed the proper foundation for an instruction on superseding cause. The Tennessee Court of Appeals disagreed, concluding that a superseding cause instruction was not appropriate under the facts of its case. The court stated that while the superseding cause doctrine has survived the adoption of comparative fault and is not limited to negligent acts of third parties, the question of whether Godbee's arachnoiditis resulted from the surgery performed by the orthopedic surgeon or whether the condition was simply the natural progression of preexisting degenerative disc disease related to cause in fact. Consequently, there was a basis for giving a standard jury instruction on proximate cause but not for superseding cause. *Godbee*, 213 S.W.3d at 888-89.

In coming to this conclusion, the *Godbee* court referred to a case from the New Mexico Court of Appeals, *Chamberland v. Roswell Osteopathic Clinic*, 130 N.M. 532, 27 P.3d 1019 (Ct. App.), *rev. denied* 130 N.M. 713 (2010). In *Chamberland*, the patient went to Roswell Osteopathic Clinic while experiencing abdominal pain. He was diagnosed with a urinary tract infection and was prescribed antibiotics and pain killers. Chamberland returned to the clinic a

week later, where an examination indicated an inflamed prostate gland. After that, he went to four other doctors unaffiliated with the clinic, none of whom observed the classic symptoms of appendicitis. Ultimately, a doctor at the clinic referred Chamberland to a urologist who diagnosed appendicitis. Chamberland underwent surgery, but his appendix had already ruptured and created a large abscess.

When Chamberland sued the clinic for malpractice, the defendant asserted that appendicitis was not detectable during the time that the clinic's doctors treated Chamberland and the subsequent intervention of the appendicitis constituted an "independent intervening cause." *Chamberland*, 130 N.M. at 535. Chamberland argued that the appendicitis was already present when he first visited the clinic and the clinic's doctors were negligent in failing to diagnose appendicitis.

The New Mexico Court of Appeals determined that the evidence demonstrated no more than a simple dispute over causation in fact, *i.e.*, whether the clinic's negligence did or did not cause in fact the injuries suffered by the patient. The appellate court explained that "[w]ithout some initial tortious act or omission by a defendant that precipitates the plaintiff's ultimate injury, subsequent causes and their injuries cannot 'intervene.' " *Chamberland*, 130 N.M. at 536.

The *Chamberland* court determined that the dispute in its case "illuminate[d] the distinction between a true independent intervening cause and a mere dispute over causation in fact without an independent intervening cause." *Chamberland*, 130 N.M. at 537. Only two scenarios were possible with respect to the patient's appendicitis—either the appendicitis was present at the time the clinic's doctors examined him or it was not. If Chamberland's evidence showed the appendicitis was present and detectible through the exercise of ordinary care when he was examined at the clinic, it could be found liable for the injuries that followed. If, on the other hand, the appendicitis was not reasonably detectable at that point in time, then any negligence in the treatment of the patient's urinary tract infection could not have been the cause in fact of the abscess and other injuries. The New Mexico Court of Appeals concluded that "[n]either circumstance justifies an independent inter-

vening cause instruction." *Chamberland*, 130 N.M. at 537. Instead, the standard instruction on proximate cause was appropriate.

Other than supporting the argument that an intervening cause can arise in a medical malpractice context, we fail to see how *Godbee* or the case on which it relied—*Chamberland*—lends support to Nurse Deruy and Dr. Paoni. In this case, there was a question of whether an infection was present at the time Nurse Deruy examined and treated Ronald. And there was a question of whether Nurse Deruy and Dr. Paoni failed to realize the gravity of his medical condition, failed to diagnose his condition, and were negligent in their treatment or lack thereof. These issues go to the cause in fact of Ronald's injuries. See *Cagnolatti v. Hightower*, 692 So. 2d 1104, 1111 (La. App. 1996) (holding that trial court in medical malpractice action against neurologist and nurse involved in treating stroke victim did not err in failing to give an intervening cause instruction; while defendants claimed that victim suffered cardiac arrest and ultimately died from stroke rather than from adverse reaction to drug they had administered, there was no argument that cardiac arrest was caused by both drug and stroke); *Vallery v. State*, 118 Nev. 357, 375, 46 P.3d 66 (2002) (holding that defendant was not entitled to intervening cause instruction in prosecution for elder abuse involving a resident of defendant's care facility who died of organ failure due to hypothermia after leaving the facility without his caregiver's knowledge; possibility that resident died of cardiac arrest was not a superseding cause since there was no evidence that cardiac arrest alone, without the hypothermia, was the sole cause of resident's death); 57A Am. Jur. 2d, Negligence § 599 (Under the Restatement [Second] of Torts § 443 [1964], "the intervention of a force which is a normal consequence of a situation created by the actor's negligent conduct is not a superseding cause of harm which such conduct has been a substantial factor in bringing about.").

Nor does the second case from the Tennessee Court of Appeals cited by Nurse Deruy and Dr. Paoni—*White*, 254 S.W.3d 411—persuade us that an intervening cause instruction was appropriate in this case. In *White*, it was alleged that a physician negligently overdosed a patient. This resulted in the patient being placed in

the intensive care unit (ICU) and on a ventilator. The physician presented evidence establishing that the patient responded to treatment and that the overdose did not cause brain damage. Nevertheless, the patient later suffered brain damage after several hours of restricted oxygen flow through the endotracheal tube. Expert testimony established that the standard of care was for ICU nurses and respiratory therapists to periodically suction a patient who is on a ventilator. This standard was not met, and the airway became obstructed. The patient received inadequate oxygen for a period of time in excess of 4 hours. According to the testimony, the ventilator sounded alarms beginning around 9 p.m., but the nurses did not call the critical care physician until 1:30 a.m. The critical care physician quickly removed the blockage, but the damage was irreversible. Based on this evidence, the Tennessee Court of Appeals concluded that "the alleged negligent care [the patient] received in the ICU could not have been reasonably foreseen by" the doctor. *White,* 254 S.W.3d at 421.

In other words, testimony established the type of care that was foreseeable in an ICU and, conversely, established it was not foreseeable that ICU nurses and respiratory therapists would ignore several hours of risky pressure readings and alarms. The negligence was so extraordinary it was distinguishable from situations where ordinary negligence by subsequent health care providers is foreseeable.

### Evidence in This Case

Although Nurse Deruy and Dr. Paoni did not cite *White* in their briefs before the Court of Appeals and, therefore, the court did not address that decision, it considered similar principles regarding intervening cause and applied them to the facts of this case. The Court of Appeals concluded there was *no* evidence to support the theory that subsequent negligence was not foreseeable. The Court of Appeals noted there was "clear expert testimony that Dr. Munshi breached the applicable standard of care. Nevertheless, no medical expert for defendants opined that Dr. Munshi's care was so deficient that the defendants could not anticipate it." *Puckett,* slip op. at 11.

On review, Nurse Deruy and Dr. Paoni argue the Court of Appeals reweighed the evidence, which they point out the Tennessee Court of Appeals stated in *White* it could not do. Indeed, this court has stated that " '[w]hether risk of harm is reasonably foreseeable is a question to be determined by the trier of facts. Only when reasonable persons could arrive at but one conclusion may the court determine the question as a matter of law.' [Citations omitted.]" *Nero v. Kansas State University*, 253 Kan. 567, 583, 861 P.2d 768 (1993). Here, the defendants argue there was evidence sufficient to justify giving the intervening cause instruction. In a Rule 6.09(b) (2009 Kan. Ct. R. Annot. 47) letter submitted after oral argument, Dr. Paoni's counsel summarized the argument, stating:

"Although the use of the BiPAP mask was foreseeable, it was the replacement of the BiPAP on Mr. Puckett after his stomach had become full of fluid and was not emptying well from a cause totally unrelated to sepsis that was not reasonably foreseeable by defendant, and there was evidence adduced to that effect. Although some risk of aspiration might have been forseeable, aspiration from this cause was not."

In support of their contention, Nurse Deruy and Dr. Paoni point to the testimony of defense expert Dr. McKinsey who opined that Ronald's "death was from aspiration, not from bacteremia." Dr. McKinsey also opined that sepsis caused the respiratory distress. But he stated that "the reason [Ronald] aspirated is he had a whole lot of fluid in his stomach and I can't blame that on the sepsis." When asked why Ronald, who was a diabetic, had fluid on his stomach, Dr. McKinsey stated it "must have been from something that he ate or drank and presumably his stomach was not emptying as well as [it] should" because of "[a]n acute illness in general or an operation, diabetes." He explained further that Ronald "had a whole lot of fluid in his abdomen and he was being treated with a positive pressure face mask which provided oxygen and also increased pressure in his stomach. So it seems to me that the reason he aspirated is he had a stomach full of fluid under pressure." When asked why he was on the positive pressure face mask, Dr. McKinsey answered: "The sepsis itself and then the fluids that are necessary to treat the sepsis."

In other words, Dr. McKinsey's testimony established a cause in fact relationship between the treatment of the sepsis and Ronald's death. The connection can be traced through the following connections: (1) Ronald's infection or bacteremia, which Nurse Deruy and Dr. Paoni allegedly failed to properly diagnose and treat, caused systemic inflammatory response syndrome or sepsis that became severe; (2) the sepsis was treated with fluids; (3) sepsis and fluid retention led to Ronald's respiratory distress; (4) Ronald's respiratory distress required respiratory care, and one method of treatment is a BiPAP mask; (5) a BiPAP mask can cause pressure on the stomach; and (6) aspiration can result from "a stomach full of fluid under pressure." Hence, according to Dr. McKinsey, no single factor, including the sepsis, caused the aspiration event. Rather, various causes contributed to causing the aspiration that was triggered when Ronald was placed back on the BiPAP mask. In light of the concurring causes, the issue for the jury was whether Nurse Deruy and Dr. Paoni committed negligence that was the cause in fact of the need to use some form of respiratory assistance that led to the foreseeable use of the BiPAP mask. If that cause in fact was established, Dr. McKinsey connects Nurse Deruy's and Dr. Paoni's acts or omissions with the other causes of the aspiration event. His testimony thus does not provide evidence on which a reasonable jury could find a superseding, intervening cause.

Further, even if we were to accept that the evidence was sufficient to create a jury question on whether there was a superseding, intervening cause, there must also be evidence that such cause was not foreseeable. In this case, that question was whether the aspiration event was reasonably foreseeable to Nurse Deruy and Dr. Paoni, who obviously are health care providers and would be foreseeing the potential course of treatment of a patient and that treatment's potential risks. These are matters beyond the common knowledge of a lay jury and would require expert testimony. In *Hare v. Wendler*, 263 Kan. 434, 440, 949 P.2d 1141 (1997), this court held that expert testimony is generally required in medical malpractice cases to establish the applicable standard of care and to prove causation, except where lack of reasonable care or existence of proximate cause is apparent to an average layperson from

common knowledge or experience. See *Collins v. Meeker*, 198 Kan. 390, 394, 424 P.2d 488 (1967). In other words, if causation "is not one within common knowledge, expert testimony may provide a sufficient basis for it, but in the absence of such testimony it may not be drawn." Prosser and Keeton, The Law of Torts § 41, p. 269 (5th ed. 1984).

Dr. McKinsey did not directly address whether it was foreseeable that a patient would be placed back on the BiPAP mask after eating. Dr. Williams, another defense expert, did however.

Dr. Williams agreed with Dr. McKinsey that Ronald's death resulted from aspiration. He explained that without the aspiration Ronald would not have suffered cardiac arrest or anoxic brain injury. In his opinion, Ronald's death was due to the fact that Ronald was on the BiPAP mask, developed gastric distention, vomited, and aspirated the vomit which caused an obstruction in his airway. In turn, the obstruction caused Ronald's oxygen level to drop and the lower oxygen levels resulted in cardiac arrest. Dr. Williams testified it was foreseeable that a patient with sepsis would need respiratory assistance and in such a case the choice was either a PAP device or intubation. While he faulted Dr. Munshi for using the BiPAP instead of a ventilator, he agreed that the use of a BiPAP mask was "fairly common" and it was "fairly common" to allow patients to eat while they were on a BiPAP mask. Dr. Williams also testified a recognized risk of using a PAP device was aspiration.

Hence, the only expert testimony before the jury about the likelihood of using the BiPAP mask and using the BiPAP mask after eating was that it was "fairly common." Further, the evidence was clear and uncontested that aspiration was a known risk of using the BiPAP mask.

This conclusion is not reached by reweighing evidence but looking for any evidence which can be viewed in a light favorable to Nurse Deruy's and Dr. Paoni's position. We have examined the record as a whole and given special attention to each of the record citations given by Nurse Deruy and Dr. Paoni. We find no evidence supporting a conclusion that the aspiration event was not foreseeable. Hence, whether the aspiration resulted from negligence or not, it was a foreseeable consequence of the treatment alleged to

have been necessitated by Nurse Deruy's and Dr. Paoni's alleged negligence. Thus, considering the evidence in a light most favorable to Nurse Deruy and Dr. Paoni, we determine that the Court of Appeals correctly concluded this case is not one of extraordinary circumstances where an intervening cause instruction should have been given.

*Harmless Error Analysis*

Nurse Deruy and Dr. Paoni contend that even if the trial court erred by giving an intervening cause instruction, the error was harmless because the jury found no fault on the part of either Nurse Deruy or Dr. Paoni. They cite our oft-stated harmless error standard, under which the instructions "are to be considered together and read as a whole, and where they fairly instruct the jury on the law governing the case, error in an isolated instruction may be disregarded as harmless. If the instructions are substantially correct and the jury could not reasonably have been misled by them, the instructions will be approved on appeal." *Wood v. Groh*, 269 Kan. 420, 423-24, 7 P.3d 1163 (2000).

The Court of Appeals determined it could not find the error harmless. *Puckett*, slip op. at 14. In reaching this conclusion, the Court of Appeals noted that the jury could answer the first question on the verdict form—whether either Nurse Deruy or Dr. Paoni were at fault—without reaching the issue of intervening cause. The court noted, however, that knowing "whether the jury did so demands a level of clairvoyance that we do not enjoy" because the jury might have reached the no-liability conclusion after concluding an intervening cause cut off Nurse Deruy's and Dr. Paoni's liability. *Puckett*, slip op. at 13. Further, the Court of Appeals noted the instructions and verdict form did not explain that the intervening cause would cut off liability only for those damages occurring after the aspiration event. Rather, the instructions and verdict form were misleading in allowing the conclusion that the intervening cause could shift liability entirely. *Puckett*, slip op. at 12-14.

We agree with the Court of Appeals' analysis that the instructions were misleading because they suggested an intervening cause could relieve Nurse Deruy and Dr. Paoni of liability for all dam-

ages, including those incurred before the intervening cause—*i.e.*, the aspiration event. Hence, if we were to accept Nurse Deruy's and Dr. Paoni's arguments that there was sufficient evidence to support an intervening cause instruction, we would not be able to discern whether the jury had determined Nurse Deruy and Dr. Paoni were not at fault because they did not meet the applicable standard of care by finding their negligence did not cause the injury or because an intervening cause superseded their negligence. Because of the possibility that the jury based its decision on intervening cause, a remand would be necessary to clarify the limited impact of the intervening cause on liability and damages.

There is a more significant problem, however, because there was no evidence of an intervening cause. Ironically, Nurse Deruy and Dr. Paoni have a stronger argument that there was harmless error in light of the complete lack of evidence because we must presume the jury followed the instructions. If the jury correctly applied the instructions, it would not have found there was an intervening cause because there was no evidence to support that finding. See *City of Mission Hills v. Sexton*, 284 Kan. 414, Syl. ¶ 20, 160 P.3d 812 (2007) (jury presumed to follow instructions).

Nurse Deruy and Dr. Paoni suggest such a conclusion is appropriate and point us to a case decided by the Texas Court of Appeals, *James v. Kloos*, 75 S.W.3d 153 (Tex. App. 2002), in support of their contention. In *James*, the patient brought a medical malpractice action against a nurse, alleging he developed a staph infection in his surgically replaced knee after slipping and falling on the knee while in the nurse's care. One issue raised on appeal by the patient was that the trial court erred in submitting to the jury an instruction on " 'new and independent cause' " when no evidence was introduced to support a finding of new and independent cause. *James*, 75 S.W.3d at 161. The nurse asserted that the trial court properly gave an intervening cause instruction because the jury could have found that the patient's staph infection was caused by something other than his fall.

The *James* court, applying an abuse of discretion standard of review, determined that the trial court erred in giving an intervening cause instruction. *James*, 75 S.W.3d at 163. Further, the nurse

failed to present any evidence that James' injury was not a reasonably foreseeable result or natural consequence of the incident in question. *James*, 75 S.W.3d at 163.

In considering whether the trial court's decision to instruct the jury on intervening cause was harmless, the *James* court stated: "It is a rare case in which the incorrect inclusion of 'new and independent cause' in the jury charge is reversible error. [Citations omitted.] . . . An improper instruction is especially likely to cause an unfair trial when the trial is contested and the evidence is sharply conflicting. [Citation omitted.]" *James*, 75 S.W.3d at 163.

The *James* court indicated that while there was conflicting evidence on the standard of care, causation, and the circumstances surrounding the underlying event, James failed to identify any evidence in the record suggesting that "the verdict was *probably* a result of the inclusion of the improper instruction." *James*, 75 S.W.3d at 164. During closing arguments, there was an emphasis on the nurse's negligence, but "new and independent cause" was only mentioned twice. Further, the nurse had presented substantial evidence that she was, in fact, not negligent in her care of James, which she emphasized during closing arguments. In addition, according to the *James* court: "[T]he jury's 'no' answer to the question '[d]id the negligence, if any, of those named below proximately cause the injury in question' could very well have been based on its determination that [the nurse] was not negligent." *James*, 75 S.W.3d at 164. The appellate court acknowledged that the submission of a single question on negligence and proximate cause means that the jury could have based its verdict either on the improper proximate cause instruction or on a finding of no negligence, but the mere possibility did not satisfy the proof requirement to establish reversible error. *James*, 75 S.W.3d at 164; see also *Contois v. Town of West Warwick*, 865 A.2d 1019, 1027-28 (R.I. 2004) (in case against emergency medical technicians where child choked to death after vomiting during a seizure, it was error to give intervening cause instruction because there was no evidence to support the instruction; but unwarranted instruction was harmless under "holistic" approach to examination of instructions).

There is contrary authority, however, including two out-of-state cases we previously discussed, *Godbee v. Dimick*, 213 S.W.3d 865, 897 (Tenn. App. 2006), and *Chamberland v. Roswell Osteopathic Clinic*, 130 N.M. 532, 538, 27 P.3d 1019 (Ct. App.), *rev. denied* 130 N.M. 713 (2001). In *Godbee,* the Tennessee Court of Appeals applied a harmless error standard similar to ours and concluded it could not say the various errors, which included giving the intervening cause instruction that was not supported by the evidence, did not substantially affect the jury verdict. *Godbee*, 213 S.W.3d at 897. The multiple errors distinguish that case, however. But, in considering the single error of giving an intervening cause instruction that was not warranted by the evidence, the New Mexico court in *Chamberland* held the error was reversible, and the court stated:

"Having determined that the court erred in giving an instruction unsupported by the evidence, prejudice is presumed. As our Supreme Court stated in [citations omitted], '[w]e compel the reversal of errors for which the complaining party provides the slightest evidence of prejudice and resolve all doubt in favor of the complaining party.' The Chamberlands have met their burden by demonstrating that there was no evidence to support the instruction. [Citations omitted.] With prejudice presumed from an instruction unsupported by the evidence, reversal and remand for a new trial is required. We also observe that Defendants alone undertook the risk of demanding an instruction in the face of strenuous objection and questionable support in the record. It has always been the law in New Mexico that 'after injecting [error] into the case to influence the jury, the [appellee] ought not to be heard to say, after he has secured a conviction, it was harmless.' [Citation omitted.]" *Chamberland*, 130 N.M. at 538.

The Nebraska Supreme Court reached the same conclusion of reversible error when an instruction was not supported by any evidence, although it did so under a slightly different analysis. In *Sacco v. Carothers*, 253 Neb. 9, 16, 567 N.W.2d 299 (1997), the court stated: "A litigant is entitled to have the jury instructed only upon those theories of the case which are presented by the pleadings and which are supported by competent evidence." Under this standard, giving an intervening cause instruction was not justified, leading the court to conclude:

"An instruction on a matter not an issue in the litigation distracts the jury from its effort to answer legitimate, factual questions raised during the trial. [Citation omitted.] Submission of an issue on which the evidence is insufficient to sustain

an affirmative finding is generally prejudicial and results in a new trial. [Citations omitted.]" *Carothers*, 253 Neb. at 165.

The view of the Nebraska and New Mexico courts has some support in analogous Kansas cases. First, there is a line of Kansas cases stating that a material error in jury instructions should be presumed prejudicial. Most recently, this standard was applied by the Court of Appeals in a decision we previously mentioned in our discussion regarding foreseeability, *Barkley v. Freeman*, 16 Kan. App. 2d 575, 579, 827 P.2d 774 (1992). In *Barkley*, the plaintiff sought damages suffered in an automobile collision. It was argued that some of the plaintiff's damages arose from an aggravation of the injury in another collision that occurred 10 months later. The Court of Appeals concluded the subsequent accident was an intervening cause and found error in an instruction that prevented application of intervening cause concepts to the aggravated injury. After stating Kansas' harmless error standard for jury instructions—*i.e.*, where instructions as a whole properly instruct a jury an isolated error will be deemed harmless—the court stated: "The Kansas Supreme Court has held that an incorrect instruction must be presumed prejudicial unless the contrary is clearly shown and that an erroneous instruction on a material issue requires a reversal. [Citations omitted.]" *Barkley*, 16 Kan. App. 2d at 583.

To support this conclusion, the *Barkley* Court of Appeals cited *Van Mol v. Urban Renewal Agency*, 194 Kan. 773, 776, 402 P.2d 320 (1965), a case with no factual similarity to *Barkley* or this case. However, *Van Mol* cites to cases where a liability shifting defense— unavoidable accident—was at issue: see *Cagle Limestone Co. v. Kansas Power & Light Co.*, 190 Kan. 544, 552-53, 376 P.2d 809 (1962); *Paph v. Tri-State Hotel Co.*, 188 Kan. 76, 80-81, 360 P.2d 1055 (1961). As explained in *Paph*, giving the liability shifting instruction when it was not supported by the evidence was "prejudicial" and required reversing the jury's verdict. *Paph*, 188 Kan. at 84. These cases suggest prejudice is presumed when a jury instruction that potentially shifts liability is not supported by the evidence.

Another factor suggests the jury could have been misled by the superseding, intervening cause instruction being given in this case.

That factor is the manner in which intervening cause was argued to the jury. During the closing arguments in this case, there was very little focus on the intervening cause. Nevertheless, when intervening cause was mentioned, it was discussed in a misleading manner. One of the defense attorneys argued:

"We have an independent intervening cause that is going on over here in Joplin. Did Dr. Paoni even know Dr. Munshi was going to be the specialist to see him? Absolutely not. He sent him over to St. John's, talked to Dr. Dhawan, they direct where he's going. So does he know what's going to happen? Absolutely not."

This argument suggested the intervening cause was not foreseeable because Dr. Paoni did not know the doctor who would treat Ronald. It was not explained that the question was whether Dr. Paoni could foresee that whoever the subsequent treating physician would be would use a BiPAP mask—given Ronald's condition, which included diabetes, that might cause Ronald's stomach to not empty. Further, the arguments regarding whether Dr. Munshi's negligence or some other factor was the intervening cause were confusing. This confusion is made evident by the fact that the parties still squabble over the details of the defense theory and whether such details were raised at the trial level.

In addition, a considerable amount of defense expert testimony was dedicated to deflecting fault from Nurse Deruy and Dr. Paoni and placing it on Dr. Munshi and his use of the BiPAP mask. Although Nurse Deruy and Dr. Paoni contend the jury would have only considered any alleged negligence of Dr. Munshi for "comparative fault purposes," this is not necessarily so. Because of the intervening cause instruction, the jury could still have found Dr. Munshi was negligent and, given the way foreseeability was argued, that his negligent actions were "unforeseeable," interrupting any negligence on the part of Nurse Deruy and Dr. Paoni.

As we consider the evidence, the arguments, and the instructions as a whole, we conclude it is clearly possible and even probable that the jury was confused by its consideration of the intervening cause instruction. The Court of Appeals correctly determined that the erroneous instruction on intervening cause could have misled the jury under the facts and circumstances of this case. Conse-

quently, the jury verdict is reversed and the case is remanded for a new trial.

## OTHER ISSUES

The Court of Appeals declined to consider two additional issues raised by Susan: (1) alleged juror bias and (2) the trial court's decision to prohibit standard of care testimony from Nurse Deruy. In Susan's "Response to Petition for Review," she incorporates by reference her arguments raised before the Court of Appeals, and at oral argument, she urged this court to consider the issues in order to provide guidance on remand. See Supreme Court Rule 8.03(c)(3) (2009 Kan. Ct. R. Annot. 68) ("In a civil case, the response also may present for review adverse rulings or decisions of the district court that should be considered by the Supreme Court in the event of a new trial, provided that the respondent raised such issues in the Court of Appeals.").

We decline to address the question of juror bias because it was unique to the first trial and is not likely to arise on remand. In contrast, the second question is likely to be presented on retrial and, therefore, will be addressed. In presenting this issue, Susan alleges the trial court erred in sustaining a defense objection to the following question asked of Nurse Deruy: "Well don't you agree that if you were there without the supervising doctor present, that you had to meet a doctor's standard of care?" In addition, before defense counsel objected, the trial court *sua sponte* interrupted Susan's counsel from asking, "[I]f you proceeded to treat a patient without consulting with the supervising physician and without calling the supervising physician, you are held to the standard of care under general guidelines, you are held to the standard of care of a physician; isn't that true?"

The standard of review for questions regarding the admissibility of evidence is a multistep standard. The first question is relevance. K.S.A. 60-401(b) defines relevant evidence as evidence that is probative and material. On appeal, the question of whether evidence is probative is judged under an abuse of discretion standard; materiality is judged under a de novo standard. See *State v. Reid*, 286 Kan. 494, 507-09, 186 P.3d 713 (2008). If the evidence is relevant

to a material fact, it may be admitted in accordance with the rules of evidence. This court has clarified, however, that a trial court always abuses its discretion when its decision "goes outside the legal framework or fails to properly consider statutory limitations. For this reason, appellate courts review de novo whether a district court applied the correct legal standards when ruling on the admission or exclusion of evidence." *Boldridge v. State*, 289 Kan. 618, Syl. ¶ 10, 215 P.3d 585 (2009).

Typically the admission of expert testimony is reviewed under an abuse of discretion standard and depends on finding that the testimony will be helpful to the jury. *State v. Cooperwood*, 282 Kan. 572, 576, 147 P.3d 125 (2006). Under the circumstances of this case, we determine that there was not an abuse of discretion.

Here, the trial court refused to allow questions that sought an opinion from Nurse Deruy as to the legal standard that applies in a medical malpractice action against her as a nurse practitioner. The applicable legal standard of care is a matter on which the judge would and did provide instructions consistent with PIK Civ. 4th 123.01, which states in part:

"In performing professional services for a patient, [an A.R.N.P.] has a duty to use that degree of learning and skill ordinarily possessed and used by members of that profession and of that school of medicine in the community in which the [A.R.N.P.] practices, or in similar communities, and under like circumstances."

See also PIK Civ. 4th 123.02 (duty/standard of care of hospital); PIK Civ. 4th 123.12 (duty/standard of care of medical specialist). As the comment to PIK Civ. 4th 123.01 indicates, the factual proof related to whether this legal standard of care has been met "requires two evidentiary steps. It requires evidence as to the recognized standards of the medical community in the particular kind of case, and a showing that the health care provider in question negligently departed from the standard in treating the patient." PIK Civ. 4th 123.01, Comment.

Asking Nurse Deruy whether she believed she must meet the standard of care of a physician crosses or at least blurs the line between the judge's responsibility to instruct the jury on the applicable legal standard of care and the witness' opinion as to what

level of medical care was appropriate under the circumstances. If a witness testifies as to the legal standard, there is a danger that a juror may turn to the witness' legal conclusion rather than the judge's instruction for guidance on the applicable law. As a result, it is generally recognized that testimony expressing a legal conclusion should ordinarily be excluded because such testimony is not the way in which a legal standard should be communicated to the jury. As one federal court stated:

"Even if a jury were not misled into adopting outright a legal conclusion proffered by an expert witness, the testimony would remain objectionable by communicating a legal standard—explicit or implicit—to the jury. See *Andrews v. Metro N. Commuter R.R.*, 882 F.2d 705, 709 (2d Cir.1989); *FAA v. Landy*, 705 F.2d 624, 632 (2d Cir.), *cert. denied* 464 U.S. 895, 104 S.Ct. 243, 78 L.Ed.2d 232 (1983). Whereas an expert may be uniquely qualified by experience to assist the trier of fact, he is not qualified to compete with the judge in the function of instructing the jury." *Hygh v. Jacobs*, 961 F.2d 359, 364 (2d Cir. 1992).

In other words, while Nurse Deruy could be asked about the applicable standard of medical care, it was inappropriate to ask about the legal standard of care, and it was the legal standard that was addressed in the disputed questions. Her testimony on a legal standard of care to be supplied by the trial court would not be helpful to the jury and, in fact, would be confusing. It was not an abuse of discretion to exclude Nurse Deruy's answers, and the trial court did not err.

The decision of the Court of Appeals reversing the district court is affirmed. The decision of the district court is reversed and remanded with directions.