NOT DESIGNATED FOR PUBLICATION

No. 121,127

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

JEREMY LEON HARRIS,
*Appellant*,

v.

CITY CYCLE SALES, INC.,
*Appellee*.

MEMORANDUM OPINION

Appeal from Geary District Court; STEVEN L. HORNBAKER, judge. Opinion filed January 21, 2020. Reversed and remanded with directions.

*John W. Witten, Jeffrey D. Rowe, R. Douglas Gentile, and Rachel N. Boden,* of Rouse Frets White Goss Gentile Rhodes, P.C., of Leawood, and *Thomas J. Dickerson*, of Dickerson Oxton Law Firm, of Kansas City, Missouri, for appellant.

*Cynthia J. Sheppeard*, of Goodell, Stratton, Edmonds & Palmer, LLP, of Topeka, for appellee.

Before ATCHESON, P.J., BRUNS, J., and BURGESS, S.J.

PER CURIAM: Jeremy Leon Harris bought his first motorcycle in 2014 after obtaining his motorcycle license. Immediately after he purchased the motorcycle, the anti-lock brake system (ABS) light began flashing. Harris eventually took his motorcycle into City Cycle Sales, Inc. (CCS) to be serviced. The service technician was unable to find anything wrong with the motorcycle and returned it to Harris.

1

About a month later, Harris was injured in a single-vehicle accident. While repairing the motorcycle, another service technician discovered an electrical problem which could have caused his ABS to fail. Harris sued CCS for negligence in failing to find the problem when it serviced the motorcycle. CCS brought several claims of comparative fault, including that Harris lacked the training and experience to safely operate the motorcycle model he purchased.

The case went to a jury trial. After the close of evidence, Harris moved for a judgment as a matter of law on CCS' claim that he was inadequately trained or experienced. The district court denied the motion. Harris also objected to the jury instruction on the claim of comparative fault, which the district court overruled. The jury returned a verdict finding CCS 0% at fault and Harris 100% at fault. Harris appeals, arguing the district court erred in denying his motion for directed verdict and submitting the comparative fault claim to the jury. As we explain, the jury instruction injected reversible error into the trial and the verdict. We, therefore, reverse the judgment for CCS for that reason and remand the case for a new trial.

FACTUAL AND PROCEDURAL BACKGROUND

Harris was a member of the United States Army stationed at Fort Riley. In January 2014, he took a Motorcycle Safety Foundation course, a mandatory course for military personnel, and received his motorcycle license. About a month later, he purchased a 2014 Harley-Davidson V-Rod motorcycle with an ABS system from a dealership in Kansas City. Harris wanted a motorcycle with ABS because his motorcycle course had emphasized the safety of the ABS.

Because Harris had no experience riding motorcycles, he had the V-Rod shipped to his home in Junction City. While waiting for it to arrive, Harris read the owner's manual. When the V-Rod finally arrived, he took it to a parking lot near his home. There,

he practiced the maneuvers he had learned in his safety course until he was confident he could do them all.

Harris noticed the V-Rod's ABS light was blinking the whole time he was practicing. He knew it had activated because it vibrated the pedal. Harris thought he had read in the manual that the light should go off at a certain point. Since the ABS was working, he thought maybe he had just misread the manual.

Harris started riding the V-Rod to work and around town. The ABS light continued to blink continuously whenever he rode. Around the end of March, Harris rode the V-Rod to Texas to visit his family. On the way down, the ABS light blinked continuously. On the way back, the light started turning on and off erratically.

By the time Harris returned to Kansas, he had put about 1,800 miles on the V-Rod. He made an appointment with CCS' service department for the scheduled 1,000-mile maintenance of the motorcycle. When Harris took the V-Rod in for service, he advised Dean Mizes, a service technician and service manager for CCS, several concerns he had, including the behavior of the ABS light.

Mizes checked the V-Rod for any diagnostic trouble codes, but stated he was unable to find any. He then took the motorcycle for a test ride. During the ride, he activated the ABS several times. The ABS light also behaved properly. After the test ride, Mizes checked for trouble codes again but did not find any.

Harris testified that when he picked up his V-Rod at CCS, Mizes said he could not find anything wrong with the ABS. Mizes did not know why the light was blinking. He told Harris the motorcycle was safe to ride.

In contrast, Mizes testified he advised Harris he could not reproduce the problem with the ABS light, and that the ABS and the light worked correctly on his test ride. Mizes stated he gave Harris the option of leaving the V-Rod with CCS for further inspection or taking the V-Rod home and see how it worked. Harris took the V-Rod and never brought it back.

According to Harris, the V-Rod's ABS light started doing the same thing when he was in the parking lot leaving CCS. Harris stated he did not take the motorcycle back in because Mizes had told him nothing was wrong with the system. The ABS light continued to go on and off erratically over the next few weeks.

About a month later, Harris was riding his V-Rod and approached an intersection at 20 to 25 miles per hour. The road was dry and relatively level. There was no traffic, and nothing required an emergency stop. The V-Rod's ABS light was not on.

When the intersection's traffic light turned yellow, Harris started slowing down, and he typically downshifted when he started slowing down. After he applied the brakes, the ABS light came on solid, the rear wheel locked up, and he heard a screech. The brakes did not vibrate like they would if the ABS was activated. Harris released the front brake while holding down the rear brake like he had been taught, but it did not help. The V-Rod fell on its left side with Harris' leg under it. The V-Rod continued to slide and Harris somehow ended up on top of the motorcycle by the time it stopped. Harris was confused about what had happened because "[he] had done nothing additional to just holding the same steady brakes."

Shortly after the accident, Harris had the V-Rod towed to Historic Harley-Davidson in Topeka. Zachary Reeves, a service technician at History Harley-Davidson, checked the V-Rod's trouble codes and replaced several parts, including the ABS module. The V-Rod still had one trouble code, so Reeves called Harley-Davidson's technical

4

helpline. The helpline told Reeves to check the wiring harness, and he found a pinched wire for the rear wheel speed sensor. Reeves replaced the speed sensor fixing the problem.

As a result of the accident, Harris suffered injuries to his left leg. He eventually had surgery on his ankle and suffered severe complications. In 2016, the Army medically retired Harris after finding he was physically unfit to continue his military service.

Harris filed a petition alleging several claims against Harley-Davidson, Rawhide Harley-Davidson, and CCS. Harley-Davidson and Rawhide were later dismissed. Harris then filed an amended petition, alleging CCS was negligent in servicing his V-Rod. In that petition, Harris alleged his accident was caused by defects in the V-Rod's ABS, including a pinched wire, and these defects were present when Harris took the V-Rod to CCS for service.

In response, CCS denied any wrongdoing. It also alleged several claims of comparative fault against Harris, which were included in its pretrial questionnaire and its proposed jury instructions. Relevant to this appeal, CCS made the following allegations: (1) "[Harris] failed to seek service for his motorcycle when, as he alleges, the ABS light continued to flash or illuminate while operating at more than initial start up speed after it was serviced and tested by [CCS]"; (2) "[Harris] used improper braking and stopping procedures or otherwise misused the motorcycle . . . which caused the accident"; and (3) "[Harris] was not adequately trained or experienced to safely operate his 2014 V-Rod and his lack of training and inexperience caused his . . . accident."

At trial, Harris testified regarding the accident and resulting injuries. Harris also presented testimony from several other witnesses, including expert witness Laurence Wayne McCracken Jr., an engineer specializing in accident reconstruction. McCracken testified he had experience as a service technician and service manager at various

5

motorcycle dealerships, including a Harley-Davidson dealership. He had also done research and testing on motorcycle ABS systems.

McCracken performed an accident reconstruction based on Harris' testimony, photographs of tire and gouge marks from the scene, and photographs of the V-Rod after the accident. He testified his reconstruction was limited because he did not have much physical evidence available, but he concluded, with a reasonable degree of engineering certainty, that the cause of Harris' accident was an ABS malfunction. McCracken explained Harris applied the rear brake hard enough to lock up the rear wheel, and the malfunctioning ABS failed to keep the wheel from locking up. He said the nature of the accident was the main reason he reached this conclusion, stating:

> "[I]f the ABS were functioning properly, this couldn't happen. . . . [I]f you're straight up and down, which you would be if you were approaching that intersection, and you apply the brakes, you can stomp on them as hard as you want, the ABS will engage and the motorcycle will come to a nice controlled stop, still upright. And I cannot see any other reason why the motorcycle would go down."

McCracken stated Harris' testimony that the ABS light was on also supported his conclusion. He also testified the screeching sound Harris heard was consistent with a locked rear wheel.

McCracken believed the V-Rod already had the pinched wire when Harris took it to CCS because Harris had been complaining about the ABS light. McCracken also concluded the accident could not have caused the pinched wire because the wire was on the right side of the V-Rod but the motorcycle fell on its left side. Additionally, no evidence suggested the wire became pinched after Harris took the V-Rod to CCS but before the accident.

6

McCracken also testified Mizes did not meet the standard of care for a motorcycle technician. He stated the V-Rod had an intermittent electrical issue based on Harris' description. According to McCracken, when a motorcycle has an intermittent electrical issue that is potentially dangerous, the motorcycle should not be given back to the customer without a diagnosis. After Mizes failed to find any trouble codes and failed to reproduce the problem on the test ride, he should have consulted the V-Rod's electrical diagnostics manual. If Mizes had, he probably would have found the problem. McCracken also stated he would have expected a trouble code to be present if the V-Rod had an intermittent electrical problem, but he was not sure.

During cross-examination, McCracken testified the V-Rod was the most powerful motorcycle Harley-Davidson sold at the time. He would not have recommended the V-Rod to a new motorcycle rider like Harris because "[i]t's a big, heavy motorcycle with a lot of power." Its size and weight did not necessarily make it harder to stop, though, because the brakes are sized to the weight of the motorcycle.

When asked if Harris' inexperience may have caused him to apply the brakes hard enough to lock up the rear wheel, McCracken responded, "Possibly. I don't know." But he added this would not have been a problem if the ABS was working properly. McCracken also admitted if a rider did not depress the clutch to downshift before applying the brakes, the engine could stall, causing the rear wheel to lock up. McCracken did not believe that happened in Harris' case.

Reeves testified about the repairs he performed on Harris' V-Rod. When asked to explain what he did to repair the pinched wire, he stated, "On this case, the wire that was pinched was for the rear wheel speed sensor . . . . There are some clips that hold the wire to the frame and it's possible that during the accident, these clips could have shifted and pinched the wires and things of that nature." A few questions later, Reeves stated it was

7

generally possible that an accident could cause a pinched wire, but he was not commenting on Harris' case.

Mizes also testified at trial. He said the ABS light normally flashes when the motorcycle starts up and turns off when the motorcycle gets up to about four or five miles per hour. If the ABS light stays on, it means the ABS is not working. And in the past, when he had encountered a V-Rod with a disabled ABS, the ABS light was always on solid. If the ABS is not working, the motorcycle reverts to standard braking. Mizes said he explained to Harris the motorcycle would still have functional brakes even if the ABS was not working.

Mizes testified Harley-Davidson suggested service technicians perform a side-by-side test ride for problem motorcycles. This required the service technician to ride next to the customer on another motorcycle. Mizes stated he did not feel he could safely do a side-by-side test ride with Harris because he was a new rider and had bought the fastest motorcycle Harley-Davidson made. Mizes added that side-by-side test rides are not required, and he did not feel he needed to do one in this case. Mizes also testified he did not call the Harley-Davidson technical helpline because in his experience it could not help if he did not have a trouble code or had been unable to reproduce the problem.

Mizes stated he knew Harris was not an experienced rider and he believed the V-Rod was too powerful for Harris. Mizes also testified a rider could cause the rear wheel to lock up and skid by stalling the motor. He testified a rider can stall the motor by braking suddenly without depressing the clutch, and this can happen with inexperienced riders. He also stated the rear wheel could also skid even if the ABS was functioning, because the ABS will cause the rear wheel to turn slower than the motorcycle is going.

CCS presented testimony from William Nash, a motorcycle shop owner and mechanic who also did motorcycle crash analyses. In preparation for trial, Nash had

8

looked at the accident report; the CCS service report; the depositions of Mizes, Reeves, and Harris; and several manuals for the V-Rod. Based on this evidence, he concluded CCS had met its standard of care.

According to Nash, Mizes took the appropriate steps to address Harris' concerns about the ABS light and acted reasonably in returning the V-Rod to Harris with both the admonition he could not replicate the reported problem and the offer to hang on to the motorcycle for further inspection. Nash said he had not seen any evidence to suggest the V-Rod had a pinched wire when Mizes serviced it. He stated the V-Rod was not any more dangerous to ride after CCS serviced it than it was when Harris purchased it. Nash added Harris should have followed up with the dealership after the first test ride and should have gone back to CCS when the ABS light came on in the parking lot.

At the close of evidence, Harris moved for a judgment as a matter of law on CCS's comparative fault claims alleging he had improperly braked and was inadequately trained. Harris argued CCS had not presented any evidence that he acted negligently at the time of the wreck or that his negligence caused the wreck.

The district court ultimately denied Harris' motion. As for the improper braking claim, the district court held circumstantial evidence supported this theory. Specifically, the district court noted McCracken had testified that a rider could cause the rear wheel to lock up by applying the brakes without using the clutch to downshift. The district court also held this evidence would also support CCS' claim that Harris was inadequately trained because his inexperience could have resulted in this mistake.

Later, at the instruction conference, Harris objected to CCS' proposed jury instruction on its improper braking theory. Harris admitted some evidence suggested it was possible that improper braking could cause a similar accident, but argued no evidence supported a finding he had actually applied the brakes improperly. Additionally,

Harris argued expert testimony was needed to establish causation in this case, and CCS had not presented any on this issue.

In response, CCS's counsel advised the district court:

> "We offered evidence about the possibility of not stopping correctly in terms of not using the clutch correctly, could have stalled the vehicle and caused the wheels to lock up and loss of control. And I offered that as potential explanations [*sic*] for the accident in response to Mr. McCracken's testimony that the only possible cause was the failure—was due to the pinched wire. And I made it clear that I was offering it as a possibility.
>
> "So in the interest of keeping appropriate instructions, I—I am withdrawing even though I think the Court initially allowed the claim with regard to how Mr. Harris operated the motorcycle at the time of the accident. To prevent any misunderstanding about that, I think we need to withdraw number two [the improper braking claim], and then just proceed with the number three [the inadequately trained claim] that doesn't appear on this copy."

The district court then moved to the instruction on CCS' comparative fault claim that Harris was inadequately trained or experienced. The district court acknowledged Harris had argued this claim was not supported by the evidence and was not common knowledge. The district judge disagreed, stating, "I think anybody would know that you don't jump on a motorcycle that weighs X amount of pounds, that's a racing model-type, muscle motorcycle without proper training." The district court noted the counterargument was that Harris had a license, but added, "Well, that's argument."

Harris again objected, arguing no expert testimony suggested his inexperience or lack of training caused the accident. Additionally, no expert testimony showed Harris breached any standard of care. The district court overruled the objection. The court also rejected Harris' request for a special verdict requiring the jury to identify any grounds of comparative fault it might attribute to him.

10

During closing argument, CCS argued it was not negligent because Mizes had met his standard of care and Harris failed to prove otherwise. It argued Harris had been negligent in failing to seek service when the ABS light came on again after CCS serviced his V-Rod. CCS also argued Harris had been negligent for buying a V-Rod as his first motorcycle when he had no experience on a V-Rod and limited training otherwise. CCS did not suggest a specific act Harris committed as a result of his inexperience which then contributed to his accident. CCS only argued Harris did not act reasonably in buying a V-Rod, and his failure to act reasonably contributed to his accident.

The jury returned a verdict finding CCS 0% at fault and Harris 100% at fault. Harris then moved for a new trial. Among other claims, Harris argued the district court erred by (1) denying his motion for a judgment as a matter of law on CCS' comparative fault claim alleging he was inadequately trained; and (2) submitting this comparative fault claim to the jury. Harris argued the district court erroneously denied his motion for a directed verdict because CCS' claim was not supported by any evidence of negligence or causation. Harris also argued the district court erroneously instructed the jury on this claim because of this lack of evidence. The district court denied his motion. Harris appeals. On appeal, Harris argues both the denial of his motion for a judgment as a matter of law and the comparative fault jury instruction as reversible errors. Because we find Harris is entitled to a new trial as a result of the district court's instructional error, we do not consider the district court's ruling on the motion.

DID THE DISTRICT COURT ERR IN GIVING THE
INSTRUCTION ON HARRIS' COMPARATIVE FAULT?

On appeal, Harris argues the district court erred in giving the comparative fault instruction to the jury. He claims there was no evidence from which a reasonable jury could find him at fault for being inadequately trained and experienced to ride a V-Rod. Harris claims, as a matter of law, he was adequately trained and experienced to ride the

11

V-Rod because he had a motorcycle license. He also claims CCS did not present any evidence from which a reasonable jury could conclude his inexperience contributed to his accident.

When analyzing jury instruction issues, this court follows a three-step process. First, this court determines whether it can or should review the issue. Second, this court considers the merits of the claim to determine if error occurred. Third, if error did occur, this court must assess whether the error requires reversal. Whether a party has preserved a jury instruction issue affects the reversibility inquiry at the third step. *Siruta v. Siruta*, 301 Kan. 757, 771-72, 348 P.3d 549 (2015). Harris objected to the instruction listing CCS' comparative fault claims. We have to determine whether there was an error and, if so, whether the error was harmless. If there is a reasonable probability the error affected the outcome of the trial in light of the entire record, it cannot be dismissed as harmless. As the party benefitting from the error, CCS has the burden to prove harmlessness. 301 Kan. at 772.

We first consider whether the challenged instruction was legally and factually appropriate. *State v. McLinn*, 307 Kan. 307, 318, 409 P.3d 1 (2018). This court uses unlimited review to determine whether an instruction was legally appropriate. *State v. Johnson*, 304 Kan. 924, 931, 376 P.3d 70 (2016). As for whether the instruction was factually appropriate, this court considers whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, to support the instruction. *State v. Williams*, 303 Kan. 585, 598-99, 363 P.3d 1101 (2016).

Harris challenges Instruction No. 14. In addition to including CCS' denials of fault and affirmative defenses, that instruction informed the jury:

"The defendant claims the plaintiff was at fault in the following respects:

    "1. Plaintiff failed to seek service for his motorcycle when, as he alleges, the ABS light continued to flash or illuminate while operating at more than initial start-up speed after it was serviced and tested by [CCS].

    "2. Plaintiff was not adequately trained or experienced to safely operate his 2014 VRod and his lack of training and inexperience contributed to his May 20, 2014 accident."

Harris takes issue with the second ground of comparative fault ascribed to him based on his lack of training and experience.

A defendant asserting a comparative fault claim against another party has the ultimate burden to prove the other party's fault by a preponderance of the evidence, meaning the evidence must show the claim is more probably true than not true. See *Nauheim v. City of Topeka*, 309 Kan. 145, Syl. ¶ 5, 432 P.2d 647 (2019); *Wooderson v. Ortho Pharmaceutical Corp.*, 235 Kan. 387, 412, 681 P.2d 1038 (1984). To prove a comparative fault claim, a defendant must establish the other party was both negligent and that "'negligence caused or contributed to the event which brought about the injury or damages for which a claim is made.'" *Haley v. Brown*, 36 Kan. App. 2d 432, 437, 140 P.3d 1051 (2006). The combination of negligence and causation constitutes fault. To warrant a comparative fault instruction, CCS had to produce sufficient evidence to allow a reasonable jury to find Harris was negligent in a specific way that contributed to causing his injuries.

Negligence is the lack of reasonable care. A party is negligent when he or she fails to do something a reasonable person would do or does something a reasonable person would not do under the same circumstances. *Deal v. Bowman*, 286 Kan. 853, 858, 188 P.3d 941 (2008). Negligence must be proved by substantial competent evidence and should not be presumed. See *Yount v. Deibert*, 282 Kan. 619, 628-29, 147 P.3d 1065 (2006). In addition to showing that Harris acted negligently, CCS had to point to

13

evidence permitting the jurors to conclude that the particular act of negligence played a part in the motorcycle mishap. See *Haley*, 36 Kan. App. 2d at 437. The law refers to that connection between negligence and harm as proximate cause. See *Puckett v. Mt. Carmel Regional Med. Center*, 290 Kan. 406, 420, 228 P.3d 1048 (2010). And, as we have said, comparative fault requires both negligent conduct and proximate cause. See *Wasson v. Brewer's Food Mart, Inc.*, 7 Kan. App. 2d 259, 265, 640 P.2d 352 (1982) ("[N]egligence in the abstract is never actionable. Actionable negligence is that which *causes* harm.").

Given those principles, the jury instruction falls markedly short in the second way Harris purportedly was at fault. The instruction generically cites his lack of training and experience in operating the V-Rod. But in this case Harris' limited training and inexperience are not particular acts or omissions that can be compared with what CCS did or did not do in servicing the V-Rod. As presented, that part of the instruction simply invites the jurors to speculate and, thus, to ascribe all sorts of real or imagined shortcomings to Harris in how he may have operated his motorcycle. Jury instructions, however, are supposed to channel the jurors' attention to fairly precisely defined allegations of negligence that may be considered as fault. See *Zak v. Riffel*, 34 Kan. App. 2d 93, 103-04, 115 P.3d 165 (2005); *Fry v. Jay Hatfield Mobility, LLC*, No. 114,266, 2016 WL 3856195, at *9 (Kan. App. 2016) (unpublished opinion) ("In formulating a contentions instruction, the trial court serves as a gatekeeper requiring the parties to make specific allegations of fault and requiring that the specific allegations are supported by evidence presented at trial.").

The product here granted the jurors an impermissible roving commission to impute negligence to almost anything they might consider to be Harris' inexperience or lack of training or to treat any such shortcoming as a foundation for some otherwise speculative act or omission on Harris' part. See *Chicago, B. & Q. R. Co. v. Bowland*, 79 Kan. 859, 100 P. 1134 (1909) (court affirms verdict because jury was "not given a roving commission to hold the defendant to any kind of want of care"); *Fry*, 2016 WL 3856195,

at *9 (discussing erroneous jury instruction on comparative fault as roving commission); see also *Wright v. Kansas State Board of Education*, 46 Kan. App. 2d 1046, 1071, 268 P.3d 1231 (2012) (Atcheson, J., concurring) ("a roving commission [grants] authority exercised without defined limitations or standards"). This sort of amorphous jury charge largely left Harris without an effective means of defusing whatever ostensible negligence the jurors might creatively attach to his short time as a motorcyclist. Tort law does not impose that sort of guessing game on parties alleged to have been negligent, be they plaintiffs or defendants.

CCS argues that the instruction was appropriate because driver inexperience itself can amount to negligence. We are unpersuaded by CCS's proposition as a general statement of law and, thus, as a basis for salvaging the jury instruction. Lack of experience in this context does not singularly support a claim of, let alone prove, negligence. For example, if an inexperienced driver operates a vehicle with the same reasonable care as a more experienced driver would in a given situation, there is no negligence. See *King v. State*, 83 Misc. 2d 748, 754, 370 N.Y.S.2d 1000 (N.Y. Ct. Cl. 1975) ("[A] person can be an inexperienced driver and still be declared free of contributory negligence as long as he drives in a reasonably prudent fashion under the conditions encountered."). To establish a claim of negligence, a party would need to show an inexperienced driver engaged in some specific negligent conduct that might be attributed to a lack of experience. But it is the conduct itself, not the underlying reason for the conduct, that constitutes actionable negligence. See *Michaud v. Wood*, 1998 ME 156, 712 A.2d 1068, 1069 (1998) ("[I]nexperience alone does not constitute negligence, but . . . a deviation from the standard of ordinary care caused by inexperience does constitute negligence."). In short, inexperience is neither a sufficient nor a necessary condition to find negligence in a case like this.

CCS similarly argues a driver's inexperience may be considered a potential cause of an accident, and it cites several out-of-state cases to support its position. See *Lopez v.*

15

*Wink Stucco, Inc.*, 124 So. 3d 281, 284, 38 Fla. L. Weekly D1976 (Fla. Dist. Ct. App. 2013); *Kinsey v. Kolber*, 103 Ill. App. 3d 933, 953, 431 N.E.2d 1316 (1982); *Klanseck v. Anderson Sales & Service, Inc.*, 426 Mich. 78, 89-90, 393 N.W.2d 356 (1986); *Marrow v. State of New York*, 105 A.D.3d 1371, 964 N.Y.S.2d 330 (2013). Those cases involved inexperienced and often unlicensed drivers who otherwise engaged in specific acts or omissions alleged to be negligent. The courts generally held the lack of a license or experience could be admitted as an explanation for the particular instances of substandard driving. The cases, however, do not stand for or inferentially support the categorical rule CCS advances—lack of training or experience alone should be adequate to establish negligence or, more precisely, comparative fault.

CCS has tried to tether its notion to Kansas law by citing *Yount*, but the connection is a poor one. In that case, the plaintiff alleged that several minors playing with matches, candles, and flammable liquids in the living room of a house—"pyromaniacal activities" in the words of the opinion—caused a fire that killed two occupants of the home. 282 Kan. at 620. The plaintiff submitted the minors did not intend to burn down the house but failed to fully extinguish the results of the fiery game playing. A fire marshal determined the fatal fire likely originated in the living room but could not pinpoint a precise cause. The district court granted summary judgment to the defendants because the plaintiff could not demonstrate the specific instrumentality causing the fire. The Kansas Supreme Court reversed summary judgment, finding sufficient circumstantial evidence of causation to submit the case to a jury. Although the record evidence did not establish what exactly caused the house fire, the evidence strongly suggested some part of the minors' concerted activities to be the proximate cause. The court held the evidence presented a jury question on causation and found the apportionment of fault among the minors should be left for the jury. 282 Kan. at 631, 634.

The *Yount* decision does very little to bolster the comparative fault instruction based on Harris' relative limited experience and training as a motorcyclist. The failing of

16

the instruction lies in its general and quite abstract description of Harris' purported negligence based on his lack of training and experience. The issue in *Yount* was not the character of the conduct as negligence—the minors did all sorts of remarkably careless things—so much as it was causation in identifying one or more of those negligent acts as the source of the fatal fire.

In this case, the district court took a swing and (in our view) a miss at justifying the instruction on the grounds that jurors could rely on their common knowledge to assess the effect of Harris' inexperience and lack of training on the mishap. We are constrained to disagree. The district court's position seems to play off of two contentions CCS advanced on comparative fault:  First, Harris was negligent as a novice motorcyclist for buying and operating the V-Rod, as a high-performance motorcycle; and second, he failed to brake correctly causing the mishap.

Jurors typically would not have any sort of detailed knowledge of the proper operation of a large, high-performance motorcycle or the characteristics of such a motorcycle as compared to smaller motorcycles. See *Wessar v. John Chezik Motors, Inc.*, 623 S.W.2d 599, 602 (Mo. App. 1981) ("The technique of motorcycle operation . . . is still unfamiliar to the average juror and is a proper subject of expert testimony."); cf. *Knowles v. Burlington Northern R.R. Co.*, 18 Kan. App. 2d 608, Syl. ¶ 2, 856 P.2d 1352 (1993) ("When the conclusion of causation is not within the common knowledge of a jury, expert testimony is required."). Even as licensed drivers of cars and trucks, the jurors would not be exposed to that kind of information and would not be in a position to reasonably gauge the wisdom or folly of a novice motorcyclist's decision to buy a V-Rod. Similarly, they would not be familiar with how to engage the brakes of a motorcycle. The district court's misapprehension about the scope of the jurors' common knowledge simply underscores the instruction's substantially flawed invitation to those jurors to speculate freely about Harris' purported negligence.

17

The district court also missed the mark because the ostensible negligence CCS ascribes to Harris was never sufficiently connected to the mishap resulting in his injuries. Even assuming Harris' decision to buy the V-Rod could be considered negligent because of its large size and high performance, nothing in the evidence suggested those characteristics of the motorcycle led to the accident. Harris approached an intersection at a modest speed under good to excellent driving conditions only to have the rear wheel lock as he attempted to slow down. For all the evidence indicates, the scenario would have unfolded in the same way had Harris been riding a much smaller and less powerful motorcycle. Several of the trial witnesses agreed that *if* Harris failed to engage the clutch before braking, the engine could stall, causing the rear wheel to lock. Harris, however, testified that he braked as he had been trained. No independent evidence suggests he failed to engage the clutch. So that scenario is impermissibly speculative. CCS's position begins with the assumption an inexperienced motorcyclist might be more prone to forget to engage the clutch than would a longtime rider. Maybe so. But from that predicate, CCS then wrests a conclusion—without supporting evidence and in the face of contradictory evidence—that Harris must have done so in this case or at least that a jury could reasonably so find. But, as we have explained, the rules of evidence do not stretch to impute negligence from limited experience or training alone. And the next step in the chain of inferences—that Harris failed to engage the clutch—is wholly speculative.

As a counterargument to CCS, Harris contends that his motorcycle license establishes he was sufficiently trained and experienced as a matter of law—a position he took in the district court both in support of his motion for a judgment as a matter of law and in opposition to the comparative fault instruction. Basically, Harris says a driver licensed to operate a particular type of vehicle (or at least a motorcycle) cannot be considered an inadequately trained or experienced operator of that type of vehicle. We are unpersuaded. Harris cites no authority for the standard he suggests. He relies on *Lunski v. Lindemann*, 270 Or. 316, 527 P.2d 254 (1974). In that case, the court held that the failure of a motorcycle operator to be licensed was not itself admissible to prove

18

negligence—a materially different proposition. 270 Or. at 318-19. In passing, the court observed that licensure of drivers was intended to promote public safety; but that is a long way from what Harris wants us to hold here. See 270 Or. at 320. Just as CCS's categorical rule that inexperience or lack of training directly translates into negligence misconstrues tort law, we think Harris' categorical rule that licensure precludes a determination that a driver's minimal training or experience played some part in a motor vehicle mishap is at odds with the particularly fact-bound determinations that populate negligence actions.

To sum up, the jury instruction on Harris' alleged comparative fault was overly broad in setting out the second ground based on his ostensibly limited training and experience. As a result, the jurors were invited to speculate impermissibly in ascribing fault to Harris. The instruction was erroneous.

WAS THE INSTRUCTIONAL ERROR ON COMPARATIVE FAULT HARMLESS?

As a fall back, CCS submits any error in the comparative fault instruction was harmless and, therefore, the jury verdict should stand. We disagree. As we have pointed out, CCS bears the burden of proving harmlessness, since it benefited from the erroneous instruction. See *Siruta*, 301 Kan. at 772.

In making the argument, CCS emphasizes that the jury found Harris to be 100% at fault and it to be without fault. CCS considers various possibilities that might account for that result and posits the jury could have come to that conclusion only if it relied on the first ground of comparative fault resting on Harris' failure to get the motorcycle serviced when the ABS light remained erratic after CCS' inspection. In other words, CCS says the jury would have apportioned some fault to each side if it relied on that part of the instruction identifying Harris' lack of training and experience in reaching a verdict. As we

19

explained, that reads too much into the verdict and depends on a faulty characterization of the lack of training and experience as a concurrent cause of the mishap.

Tort law recognizes that more than one cause may bring about an actionable injury. If multiple acts combine, they are treated as concurrent causes, and the actor responsible for each typically will be legally accountable for a portion of the fault for the ultimate harm. See *Puckett*, 290 Kan. at 428. That is the premise behind comparative fault. In other circumstances, a person may do something negligent that sets in motion circumstances that would harm a third party. But another person may commit a negligent act that effectively overtakes or replaces the original negligence and becomes a wholly independent cause of the injury. The overtaking act is known as a superseding cause and extinguishes legal liability or fault based on the original negligence. See *Puckett*, 290 Kan. at 421.

CCS argues the jury might have found it did everything right in inspecting the V-Rod when Harris brought it in. That is one possibility that would explain the verdict, but it is not the only one. And we cannot tell that from the verdict form. CCS also says the jury could have found it acted below acceptable standards of care in failing to find a problem with the ABS system but Harris' failure to have the V-Rod reinspected when the ABS light continued to function erratically was a superseding act of negligence, cutting off its liability. That, too, is a possibility. Again, we cannot tell if that possibility was the reality.

CCS, however, goes awry with the next step of its harmless error analysis. The company submits this theory: The jury would have to treat the second ground of Harris' comparative fault based on his lack of training and experience as a concurrent cause of the mishap that necessarily combined with its negligence in inspecting the V-Rod. So, if the jury relied on the second ground, it would have had to apportion some percentage of fault to CCS. Since the jury found CCS to be without fault, the jury must have relied only

on the first ground of Harris' comparative fault in failing to get a follow-up inspection of the V-Rod. Ergo, any error in the instruction on the second ground must be harmless because the jury did not rely on that ground.

But the foundational premise of CCS' theory is faulty. The instruction casts Harris' purported comparative fault based on lack of training and experience so broadly that it encompasses at least one possible superseding cause discussed in the evidence—Harris' failure to engage the clutch before braking as he approached the intersection. According to the trial testimony, if Harris failed to operate the clutch correctly, the engine could have stalled, and the rear wheel would have locked whether or not the ABS system was working properly. In that circumstance, Harris' mistake would have superseded any negligence on CCS' part in failing to identify and correct a malfunction in the ABS system because the wheel would have locked up regardless. Again, we have no way of knowing if the jury came to that particular conclusion, but it could have in light of the trial evidence and the jury instruction. Given that possibility, CCS cannot meet its burden to show the jury instruction was harmless to Harris, and its alternative argument for affirming the verdict and judgment fails.

CONCLUSION

We have carefully considered the parties' well-articulated arguments on appeal in light of the extensive trial record and find the comparative fault instruction given the jury materially and impermissibly disadvantaged Harris. Contrary to CCS's suggestion, the error cannot be excused as harmless. As a result, we reverse the judgment on the verdict for CCS and remand with directions for a new trial.

Because we have granted relief to Harris on his claim of instructional error, we have no need to consider his point based on the district court's denial of his motion for a judgment as a matter of law, since the relief would be the same. Any determination we

21

might make would not necessarily carry over to the retrial if the evidence differed substantively.

Reversed and remanded for a new trial.